[No. 59429-5. En Banc. April 4, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. JAMES LEROY BRETT, *Appellant.*

140

144

*Thomas C. Phelan* and *Mark W. Muenster,* for appellant (appointed counsel for appeal).

*Arthur D. Curtis, Prosecuting Attorney,* and *Richard Melnick, Deputy,* for respondent.

DOLLIVER, J. — James Leroy Brett was convicted by a jury in Clark County Superior Court of aggravated first degree murder and first degree felony murder. The jury sentenced Brett to death following a sentencing proceeding conducted in accordance with the legislative guidelines set forth in RCW 10.95. Brett appealed directly to this court alleging numerous errors occurred in the pretrial, guilt, and penalty phases of the trial. After carefully considering Brett's arguments and conducting our statutorily mandated review, we find there is no reversible error and affirm the conviction and death sentence.

## FACTS

James Leroy Brett was living in Longview, Washington, with his girlfriend, Shirley Martin, and her son, Miles, when he originated a "plan" to do "one last big job" to make their life better. Report of Proceedings vol. 12, at 93. At the

time, Martin was receiving welfare benefits, and Brett was attempting to obtain Social Security benefits.

According to the plan, Brett and Martin would select an elderly couple's house in a rich neighborhood and restrain the victims until the next day when their bank opened. Brett and Martin would force the victims to withdraw their money and then kill them by injecting a toxic substance into the back of their heads.

To facilitate commission of the plan, Martin and Brett acquired a shotgun and shells, stocking caps, gloves, duct tape, and a duffel bag. Brett also obtained three to four 100-cubic-centimeter syringes which were larger than the insulin needles Brett ordinarily used for his diabetes.

In the early afternoon of December 3, 1991, Brett and Martin dropped Martin's son, Miles, off at the house of Rhonda Camba, Brett's sister. They said they would be gone overnight and would pick up Miles the next morning. Brett and Martin drove to Vancouver and picked out an upper middle class neighborhood. They waited for nightfall to increase the likelihood the potential victims would be in bed. During that time, they had a drink at a bar, smoked marijuana, ate at a Denny's restaurant, and purchased some items at a convenience store. Martin testified they smoked a lot that day and characterized themselves as being "baked", a term Martin uses to describe being very high on marijuana.

When it was dark, Brett and Martin drove back to the Mount Vista neighborhood and parked. Each wore gloves and stocking caps that did not cover their faces. Brett felt masks were not needed because there would be no survivors. Brett picked the Milosevich residence at random. Martin rang the doorbell, and Mrs. Milosevich went upstairs to wake her husband. Brett was standing off to the side of the entrance holding a shotgun.

The parties stipulated Brett used a .410 caliber single-barreled, bolt-action shotgun. Before firing a second shot, the user would have to pull the bolt back to eject the spent

shell, place a new shell in the chamber, close the bolt, and release the safety. Both the barrel and the stock of the shotgun were sawed off.

Martin told Mr. Milosevich she was having car trouble, and when he started to open the door, Brett and Martin forced their way in at gunpoint and ordered the Miloseviches down on the floor. Mr. Milosevich remained standing. The burglar alarm was activated, and before Mrs. Milosevich could comply with Brett's demand to deactivate the system, a signal was sent to ADT Security Systems. ADT attempted to contact the occupants by telephone and, receiving no response, notified police.

Martin testified things were getting "way out of control . . .". Report of Proceedings vol 12, at 115-16. She forced Mrs. Milosevich to stay down with a knife and tried to intimidate and plead with Mr. Milosevich to cooperate. Then, Martin was thrown against the wall by someone, believed to be Brett, and when she got up, she saw Mr. Milosevich make a move toward Brett who fired the shotgun at his chest. While Brett was reloading, Mrs. Milosevich ran out of the house to the next-door neighbor's. When she started to run, Brett pointed the gun at her then turned it back toward Mr. Milosevich. Mr. Milosevich pleaded for his life saying, " 'Oh God, please don't.' " Brett responded by telling Mr. Milosevich " 'You're going to die,' . . .". Report of Proceedings vol. 12, at 116. Martin ran out of the house and heard a second gunshot. Mr. Milosevich was shot in the back of the head at close range. Brett and Martin fled the scene without taking anything from the residence.

At approximately 11:14 p.m. on December 3, 1991, a Clark County deputy sheriff was dispatched to the Milosevich residence. Upon his arrival, the deputy found the victim, Kenneth Milosevich, dead from two gunshot wounds. There were blood splatters on the floor near the victim, but there were no signs of a struggle, and nothing appeared to be disturbed in the remainder of the residence. The crime scene was contained, photographed, and videotaped by police.

Brett and Martin drove to the house of Brett's mother where he confessed to the killing. Brett also told his sister, Rhonda Camba, that he had "killed somebody". Report of Proceedings vol. 12, at 19. Brett said he did not go there to kill anyone, he just intended to rob them.

Later that day, Brett put items used in the crime in a duffel bag and threw it in the river. The police recovered the duffel bag from a slough in Longview. The duffel contained gloves, a black stocking cap, a short-sleeved shirt, two pairs of jeans, two heavy leather coats, and a yellow casing for a syringe needle. The shotgun was never recovered.

Shirley Martin was charged with and pleaded guilty to premeditated murder in the first degree, burglary in the first degree, assault in the second degree, and attempted robbery in the first degree.

On December 10, 1991, Brett was charged with aggravated murder in the first degree of Kenneth George Milosevich which charge alleged the murder was committed in the course of, in furtherance of, or in immediate flight from robbery in the first or second degree and burglary in the first or second degree. The court entered a plea of not guilty on Brett's behalf on January 13, 1992. On January 22, 1992, the State filed a notice of intent to seek the death penalty.

Thereafter, on March 27, 1992, the State filed an amended information charging Brett with aggravated murder in the first degree, adding the aggravating factors of concealment and kidnapping in the first degree (count 1). Count 2 alleged felony murder in the first degree based on robbery or attempted robbery in the first or second degree. Counts 3 through 5 alleged crimes naming Kenneth Milosevich's wife, Patricia. Count 6 alleged burglary in the first degree. The court stayed counts 3 through 6 pending resolution of count 1.

On April 16, 1992, at Brett's arraignment, the State moved to file a second amended information merging counts 1 and 2. Brett objected and attempted to plead guilty to count 2 (felony murder). The court refused the guilty plea and granted

the State's motion. The court entered a plea of not guilty on Brett's behalf. A second notice of intent to seek the death penalty was filed with the second amended information.

Brett moved for a bill of particulars on the aggravating factors of robbery, kidnapping, and concealment and moved to dismiss the aggravators of robbery and kidnapping. The court denied both pretrial motions.

During voir dire, the defense challenged 12 jurors for cause who expressed support for the death penalty. The trial court denied the challenges, and the defense was forced to use its peremptory challenges. As a result, two jurors challenged for cause sat on the jury, Deborah J. Monohan and Mark J. Bowyer. The prosecution used its peremptory challenges to exclude five jurors who expressed doubts about the death penalty.

At the close of the State's case, the trial court denied the defense motions to dismiss the concealment, kidnapping, and robbery aggravating factors for lack of evidence. The motions were renewed at the close of the defense case and were again denied.

The jury found Brett guilty of first degree felony murder and aggravated first degree murder with four aggravating factors: first degree burglary, first degree robbery, first degree kidnapping, and concealment of the perpetrator's identity.

The penalty phase commenced on June 15, 1992, and lasted $3^1/2$ days. The State opened the penalty phase by submitting certified copies of Brett's juvenile adjudications and criminal convictions. During rebuttal, the State also introduced the results of "a performance I.Q." test administered to Brett in Shelton by the Department of Corrections in March 1989 wherein he scored in the 52nd percentile. Brett was also given a basic education test which ranked him at a ninth grade education level.

The defense introduced testimony from family members, schoolteachers and administrators, and juvenile detention facility counselors and staff which detailed Brett's family

and school history. The testimony showed that Brett grew up in a poor, unstable household with little, if any, parental support or guidance, in which alcohol was abused by the adults and shared with the children at very young ages.

Brett's mother, Sherry Brett, is an admitted alcoholic and testified that while she was pregnant with James she abused alcohol and smoked $1^1/2$ to 2 packs of cigarettes every day. Brett was the youngest child and was illegitimate. He was diagnosed with diabetes when he was 8 years old.

Sherry Brett had numerous boyfriends and three marriages. While married to Robert Spurgeon, the couple separated many times and moved frequently. Thereafter, Sherry Brett married Wayne Powell, and the alcohol abuse continued. Sherry and Wayne would make up gallons of homemade Kahlua and brandy which was available to the children. Brett's sister, Rhonda Camba, testified it was not unusual while Brett was growing up for him to drink until he passed out. Brett and his three older sisters all have substance abuse problems. When Brett was about 12 years old, he attempted suicide by swallowing a whole box of diet pills.

There was also testimony that Brett had good qualities. Brett was characterized as a gentle person who had good relationships with his young nieces and nephews and Shirley Martin's son.

Brett's school history showed he was a low average student, who did well in structured environments. Brett attended school in the Longview School District and received special education for 3 years until he was 14 years old. Brett had attendance problems, and the vice principal of the middle school testified Mrs. Brett was the only mother of a student he had taken to court due to attendance problems in his 12-year tenure.

When Brett was 14 years old, he and his 18-year-old brother-in-law, Alan Blackmon, robbed a convenience store. Brett was convicted and sent to Echo Glen Children's Center, a juvenile detention facility. He received little family

support while there. On two different occasions, family members visiting Brett gave him marijuana and Valium.

In March 1985, Brett escaped by binding a female staff worker with an electrical cord and attempting to strangle her with a towel. Brett pleaded guilty and was convicted of kidnapping in the first degree, assault in the second degree, and escape in the first degree.

As a result of the incident at Echo Glen, Brett was transferred to Maple Lane School in 1985 where he resided, with two brief interruptions, until 1990 when he was released. While there, Brett was cooperative, conformed to the rules and was not physically threatening. He was enrolled in learning disabled classes, primarily vocational-type courses, and maintained a B average. He progressed from maximum to minimum security. At one point, Brett assisted a counselor in subduing a boy who had tried to grab her keys.

Brett, however, was impulsive, had low self-control, and presented an escape risk. On more than one occasion he escaped from Maple Lane by climbing over an approximately 12-foot-high chain link fence. In addition, Brett was self-destructive. He would refuse his insulin or slash his wrists. On one occasion he attempted suicide by drinking pesticide, and on another he attempted to kill himself with a razor, opening a wound that required approximately 63 stitches to close.

Juvenile authorities attempted to help Brett make the transition back into the community by transferring him first to the Oakridge Group Home and then to the Woodinville Group Home. Brett, however, either asked to be returned to the more structured environment at Maple Lane or walked away from the group homes. This resulted in adjudications for escape and his return to Maple Lane. Woodinville staff opined that one factor motivating Brett's escapes was his institutionalization. He wanted to be returned to the more structured environment at Maple Lane where he felt safer and more comfortable.

The defense also presented testimony from Robert Ryan, Ph.D., a chemical dependency and mental health counselor, regarding the causative factors of fetal alcohol syndrome/ fetal alcohol effect (FAS/FAE) and the characteristics of children suffering from the conditions. Ryan is not qualified to diagnose FAS/FAE. The trial court denied the defense motion, made on the third day of the penalty phase, for a continuance for 30 days in order to obtain the services of an expert who could evaluate and diagnose whether Brett suffered from FAS or FAE.

Based on the evidence, the jury found there were not sufficient mitigating circumstances to merit leniency and returned a death verdict.

ANALYSIS

Pretrial Issues

1. Information.

The second amended information, under which Brett was arraigned, alleged "[t]he murder was committed in the course of, in furtherance of, or in immediate flight from" robbery in the first degree, burglary in the first degree, and kidnapping in the first degree "in violation of . . . RCW 10.95.020(9)(a), RCW 10.95.020(9)(c) and RCW 10.95.020(9)(d) . . .". Clerk's Papers, at 203-04. Brett asserts the information was deficient and violated the essential elements rule because it failed to set forth the elements of the crime-based aggravating factors or make reference to the specific criminal statutes.

■ The sixth amendment to the United States Constitution and Const. art. 1, § 22 (amend. 10) require an information to include all statutory and common law elements of the crimes charged. *State v. Kjorsvik*, 117 Wn.2d 93, 101, 812 P.2d 86 (1991). Aggravating circumstances, however, are not elements of the crime, but " 'aggravation of penalty' " factors. *State v. Kincaid*, 103 Wn.2d 304, 307, 692 P.2d 823 (1985). *See State v. Irizarry*, 111 Wn.2d 591, 763 P.2d 432 (1988); *State v. Mak*, 105 Wn.2d 692, 741-42, 718 P.2d 407 (hereinafter *Mak)*, *cert. denied*, 479 U.S. 995 (1986), *sentence*

*vacated on writ of habeas corpus sub nom. Mak v. Blodgett,*
754 F. Supp. 1490 (W.D. Wash. 1991), *aff'd*, 970 F.2d 614
(9th Cir. 1992), *cert. denied,* ___ U.S. ___, 122 L. Ed. 2d
742, 113 S. Ct. 1363 (1993). The essential elements rule is
not violated.

■ In addition, the second amended information ad-
equately notified Brett which aggravating factors, if proved,
would be used to enhance his sentence. *See State v. Frazier,*
81 Wn.2d 628, 503 P.2d 1073 (1972); *State v. Nass,* 76 Wn.2d
368, 456 P.2d 347 (1969).

Brett makes a separate argument that the information
was deficient because it alleged the murder was committed
in the "course of or furtherance of robbery", rather than the
*crime* of robbery. This argument is without merit. The infor-
mation cites to RCW 10.95.020(9)(a), which lists the crime of
robbery in the first or second degree as an aggravating fac-
tor.

We find no error in the information.

2. Filing of Second Amended Information.

■ Brett contends the trial court erred in allowing the
filing of the second amended information and in refusing to
accept his plea of guilty to felony murder. We review the
granting of a motion to amend an information under an
abuse of discretion standard. *See State v. Haner,* 95 Wn.2d
858, 631 P.2d 381 (1981).

The first amended information charged Brett in two sepa-
rate counts with first degree premeditated murder (count 1)
and first degree felony murder (count 2). At arraignment,
the State moved to file the second amended information
which charged a single crime, first degree murder, by alter-
nate means, felony murder and premeditated murder. Brett
objected and attempted to plead guilty to count 2. The trial
court granted the State's motion, and Brett was unable to
enter a guilty plea to felony murder. *See State v. Bowerman,*
115 Wn.2d 794, 801, 802 P.2d 116 (1990).

■ Defendants do not have a constitutional right to plead
guilty, but this state has conferred such a right by court

rule. CrR 4.2(a) provides: "A defendant may plead not guilty, not guilty by reason of insanity or guilty." *See State v. Martin*, 94 Wn.2d 1, 4, 614 P.2d 164 (1980). The State also has a right to amend an existing information to include an alternate means of committing a crime formerly charged anytime before the verdict "if substantial rights of the defendant are not prejudiced." CrR 2.1(d); *State v. Smith*, 93 Wn.2d 329, 610 P.2d 869, *cert. denied*, 449 U.S. 873 (1980); *State v. Powell*, 34 Wn. App. 791, 793, 664 P.2d 1 (1983), *review denied*, 100 Wn.2d 1035 (1984).

Brett's right to plead guilty must be harmonized with the State's right to amend the information. *See State v. Wernick*, 40 Wn. App. 266, 270, 698 P.2d 573 (1985) (quoting and citing *Seattle v. Crockett*, 87 Wn.2d 253, 256, 551 P.2d 740 (1976) and *Emwright v. King Cy.*, 96 Wn.2d 538, 543, 637 P.2d 656 (1981)). Such harmonization is provided by CrR 2.1(d) which allows informations to be amended if substantial rights of defendants are not prejudiced thereby.

In this case, Brett has failed to show such prejudice.

Brett contends he was deprived of the ability to argue to a penalty phase jury that he accepted responsibility for Mr. Milosevich's death based upon a guilty plea to felony murder. Brett informed the jury, starting with voir dire, that he accepted responsibility for the death. He has not established the lack of a guilty plea had a detrimental effect. A jury might speculate a plea to a noncapital crime was motivated out of fear rather than integrity. Brett also asserts he was deprived of the ability to claim that a subsequent aggravated murder charge would violate double jeopardy. Parties have a right to raise issues at trial and on appeal upon compliance with applicable court rules. *See* CrR 8.2; CR 7(b); RAP 10.3(a). Brett, however, does not have a substantial right to raise this particular issue. Moreover, it would be within the Clark County Prosecutor's discretion whether subsequently to charge Brett with aggravated murder. Lastly, Brett argues he gave up substantial statutory and constitutional rights when he withdrew his objection to the

filing of the first amended information and agreed to the stay of counts 3 through 6, and, therefore, he should have been able to plead to the crimes charged in that information. The stay of counts 3 through 6, however, was not disturbed by the filing of the second amended information.

We hold the trial court did not abuse its discretion in allowing the filing of the second amended information and its refusal to accept Brett's plea of guilty to count 2 of the first amended information.

### 3. Bill of Particulars and *Knapstad* Hearing.

Brett's request for a bill of particulars and for a pretrial hearing under *State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986) on the robbery and kidnapping aggravating factors is predicated on the assumption that uncompleted crimes listed in RCW 10.95.020(9) are insufficient to trigger imposition of the death penalty. Because we hold otherwise herein, we need not reach these issues.

As to the concealment aggravator, the record does not indicate what additional information could have been furnished through a bill of particulars. Consequently, there is no lack of notice and no abuse of discretion in denying the request. *See State v. Dictado*, 102 Wn.2d 277, 286, 687 P.2d 172 (1984).

### 4. Jury Selection.

Brett contends his constitutional rights were violated by the trial court's denial of his 12 challenges for cause and his request for additional peremptories. As a result, two jurors challenged for cause served on the jury: Deborah J. Monohan and Mark J. Bowyer.

Under the Sixth Amendment and Const. art. 1, § 22 (amend. 10), a defendant is guaranteed the right to a fair and impartial jury. *State v. Rupe*, 108 Wn.2d 734, 748, 743 P.2d 210 (1987), *cert. denied*, 486 U.S. 1061 (1988). To ensure this right, a juror may be excused for cause if his views would " ' "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " *State v. Hughes*, 106 Wn.2d 176, 181, 721

P.2d 902 (1986) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 105 S. Ct. 844 (1985)). *See* RCW 4.44.170(2). A juror with preconceived ideas need not be disqualified if that juror can set those ideas aside and "decide the case on the basis of the evidence given at the trial and the law as given him by the court." *Rupe*, 108 Wn.2d at 748 (quoting *Mak*, at 707). "Equivocal answers alone" are not cause for dismissal. *Rupe*, 108 Wn.2d at 749. The trial judge is in the best position upon observation of the juror's demeanor to evaluate the responses and determine if the juror would be impartial. *Rupe*, 108 Wn.2d at 749.

We review the trial court's denial of the challenges for cause of the 12 prospective jurors under an abuse of discretion standard. *See Rupe*, 108 Wn.2d at 748.

The 12 challenged jurors either had preconceived ideas which favored imposition of the death penalty or gave equivocal answers regarding their views. After careful consideration of the voir dire of each juror, we cannot say the trial court abused its discretion in denying the challenges for cause. All potential jurors stated they could set their ideas aside and decide the case based on all the evidence and on the law as given by the court.

 Brett also asserts the State used its peremptory challenges to exclude all jurors who expressed reservations about the death penalty, resulting in a jury that was unconstitutionally death prone. The federal district court case cited by Brett in support of his position was reversed on this ground. *See Brown v. Rice*, 693 F. Supp. 381 (W.D.N.C. 1988), *aff'd in part, rev'd in part sub nom. Brown v. Dixon*, 891 F.2d 490 (4th Cir. 1989), *cert. denied*, 495 U.S. 953 (1990).

> [T]he ordinary rule [is] that a prosecutor may exercise his peremptory strikes for any reason at all" and that a prosecutor may "take into account the concerns expressed about capital punishment by prospective jurors, or any other factor, in exercising peremptory challenges. . . ."

*Brown*, 891 F.2d at 496 n.13 (quoting *Brown v. North Caro-*

*lina,* 479 U.S. 940, 941, 93 L. Ed. 2d 373, 107 S. Ct. 423 (1986) (O'Connor, J., concurring)).

We decline to address Brett's claim under Const. art. 1, § 22 (amend. 10) (right to an impartial jury) or Const. art. 1, § 14 (the cruel punishment clause) on this issue because he fails to analyze the factors set forth in *State v. Gunwall,* 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986). *See State v. Olivas,* 122 Wn.2d 73, 82, 856 P.2d 1076 (1993). *See also State v. Irizarry,* 111 Wn.2d 591, 596-97, 763 P.2d 432 (1988) (Utter, J., concurring).

## GUILT PHASE

### 5. Admission of "In Life" Photograph.

Brett contends the trial court erred in admitting an in-life photograph of Kenneth Milosevich. A trial court's ruling admitting an in-life photograph is reviewed under an abuse of discretion standard. *State v. Furman,* 122 Wn.2d 440, 452, 858 P.2d 1092 (1993).

Brett argues the photograph was not relevant because the defense offered to stipulate to the identity of the victim.

The State, however, is not required to accept the defense stipulation regarding that element of the crime. *See State v. Rice,* 110 Wn.2d 577, 598-99, 757 P.2d 889 (1988), *cert. denied,* 491 U.S. 910 (1989).

Brett also asserts the photograph was inflammatory and prejudicial. Photographs are admissible unless their prejudicial effect outweighs their relevance. *Rice,* 110 Wn.2d at 599. In-life photographs are not inherently prejudicial, especially when the jury also sees " 'after death' pictures of the victim's body". (Footnote omitted.) *Furman,* 122 Wn.2d at 452.

In this case, the photograph is an 8- by 9-inch image of Mr. Milosevich's head and neck. He is wearing a baseball cap and a blue coat, and there are evergreen trees in the background. Ex. 1. We agree with the trial court that this photograph, in and of itself, does not evoke sympathy. The photograph simply allows the jury to see what the victim

looked like in life. Brett has not shown the trial court abused its discretion in admitting this generic photograph.

### 6. Admission of Autopsy Photographs.

██ ██ Brett contends the trial court erred in admitting 4 of the 13 autopsy photographs proffered by the State. He asserts they are prejudicial and inflammatory. "Accurate photographic representations are admissible, even if gruesome, if their probative value outweighs their prejudicial effect." *State v. Crenshaw*, 98 Wn.2d 789, 806, 659 P.2d 488 (1983). Photographs have probative value when "they are used to illustrate or explain the testimony of the pathologist performing the autopsy." *State v. Lord*, 117 Wn.2d 829, 870, 822 P.2d 177 (1991), *cert. denied*, 113 S. Ct. 164 (1992). *See State v. Sargent*, 40 Wn. App. 340, 349, 698 P.2d 598 (1985) (photographs should not be admitted when the same information could be revealed in a nonprejudicial manner). This court, however, looks unfavorably on repetitious, inflammatory photographs. *Crenshaw*, 98 Wn.2d at 807. The court reviews the admission of autopsy photographs under an abuse of discretion standard. *Crenshaw*, 98 Wn.2d at 806.

In this case, exhibit 19 shows the victim's chest wounds. Exhibits 25 and 28 show the injury to the victim's head with exhibit 28 indicating that the shape of the injury matches the shape of the shot cup from the shotgun. Exhibit 29 shows the wound to the victim's left thumb.

Dr. Karen Gunson, the deputy medical examiner for the State of Oregon, performed the autopsy on Mr. Milosevich and directed the photographs be taken. Dr. Gunson testified these photographs would aid in explaining her findings to the jury and would present a more accurate representation of the injuries than could be depicted with a diagram. Specifically, she stated the photographs would aid in explaining her opinion concerning the distance of the gun from the wounds.

Dr. Gunson described the wounds and gave her opinion regarding the distance of the muzzle to the wounds prior to showing the photographs to the jury. This procedure is not

objectionable. The photographs aided the jury in its understanding of Dr. Gunson's prior verbal description. In addition, the four admitted photographs were not repetitious or cumulative. Although the photographs could be disturbing, Brett has not shown the trial court abused its discretion in admitting them.

### 7. Lay Opinion Testimony.

Brett asserts the trial court erred in allowing Katherine Quinn to give her lay opinion that Brett did not appear to be under the influence of alcohol, drugs, or any other substance on the night of the murder. Quinn was the clerk on duty at the convenience store patronized by Brett and Martin just prior to the murder. Brett argues her opinion should not have been admitted, pursuant to ER 701, because Quinn lacked knowledge or information sufficient to form an opinion regarding Brett's state of sobriety and because her opinion was not helpful in explaining her testimony or the determination of a fact in issue.

The admission of opinion evidence lies within the discretion of the trial court. *State v. Weygandt*, 20 Wn. App. 599, 606, 581 P.2d 1376 (1978), *review denied*, 91 Wn.2d 1024 (1979); *Hill v. C.&E. Constr. Co.*, 59 Wn.2d 743, 370 P.2d 255 (1962).

The State contends there was a sufficient foundation for Quinn to give her opinion on Brett's sobriety because she had been a police officer in Montana for 2 years where she became familiar with the characteristics of people under the influence of intoxicating substances.

ER 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

In this case, Quinn's opinion was based upon her observation of Brett on two separate occasions on the night of the

murder, the second time for approximately 7 to 10 minutes. Quinn's perception was informed by her prior experience as a police officer in Montana where she had occasion to become familiar with the effects of intoxicating substances. Her opinion was rationally based upon her perception. In addition, the opinion was helpful to the determination of a fact in issue, that of premeditation and intent. Both requirements of ER 701 were met. There was no abuse of discretion in allowing the testimony.

8. <u>Robbery Aggravator.</u>

Brett contends there was insufficient evidence to submit to the jury the aggravating circumstance of robbery in the first degree. Brett contends conduct which establishes that robbery in the first degree has been attempted, but not completed, is insufficient, as a matter of law, to constitute an aggravating circumstance under RCW 10.95.020(9)(a), which provides:

> A person is guilty of aggravated first degree murder if he or she commits first degree murder as defined by RCW 9A.32.030(1)(a) . . . and one or more of the following aggravating circumstances exist:
>
> . . . .
>
> (9) The murder was committed in the course of, in furtherance of, or in immediate flight from one of the following *crimes*:
>
> (a) Robbery in the first or second degree . . ..

(Italics ours.)

Brett argues the term "crimes" requires the murder be committed in the course of or in furtherance of a *completed* crime because the statute does not refer to attempted crimes. In contrast, Brett points to the felony murder statute, RCW 9A.32.030(1)(c), which expressly provides that one who kills while he "commits or attempts to commit the crime" of robbery is guilty of felony murder.

The State asserts a premeditated murder committed in the course of or in furtherance of a robbery, even when the robbery is not completed, is sufficient to find the existence of an aggravating circumstance. We agree.

■ The felony murder statute, RCW 9A.32.030(1)(c), provides that when a death occurs in the course of robbery in the first or second degree, or in the course of an attempted robbery, the participants are guilty of felony murder. In contrast, under RCW 10.95.020(9)(a), only premeditated murders committed during the course of robbery are within the scope of the statute. Premeditated murders committed during the course of an attempted robbery are not. Whether the death penalty may be imposed depends upon whether the murder occurs *"in the course of"* the robbery, not whether the robbery was completed or attempted.

Similar statutes have been so construed in Illinois and Georgia. *See People v. Walker*, 91 Ill. 2d 502, 440 N.E.2d 83 (1982). *See also Amadeo v. State*, 243 Ga. 627, 255 S.E.2d 718 (1979).

In Illinois, the aggravated first degree murder statute provides:

"(b) Aggravating factors. A defendant * * * who has been found guilty of murder may be sentenced to death if:

* * *

6. the murdered individual was killed *in the course of another felony* if:

* * *

(c) the other felony was one of the following: . . . robbery . . .."

*Walker*, 91 Ill. 2d at 510 (quoting Ill. Rev. Stat. ch. 38, para. 9-1(b)(6)(c) (1977)). The defendant in *Walker* killed a person in an attempted robbery. After being sentenced to death, the defendant claimed the robbery was not properly used as an aggravator because the statute did not include attempt in its list of crimes triggering the death penalty. The court disagreed and responded:

Whether the murder is committed in association with the actual completion of the aggravating felony or only with the attempted felony is not crucial. The aggravating factor which triggers the application of the death penalty statute is that the murder be committed *"in the course of"* the aggravating felony. A murder may be committed "in the course of" an

armed robbery whether or not the actual armed robbery is consummated.

An essential element of an attempt is that the accused perform "any act which constitutes a substantial step toward the the commission of that offense." It is a question of fact whether "[an] act which constitutes a substantial step toward the commission of" armed robbery constitutes "in the course of" an armed robbery, so that that act becomes an aggravating factor authorizing imposition of the death penalty. We again emphasize that the death penalty statute specifies as an aggravating factor that the murder be committed "in the course of" one of the listed felonies. The statute does not require that the other felony be completed or that the defendant be charged with or convicted of the other felony or an attempted felony.

The death penalty statute does require the State to prove beyond a reasonable doubt the aggravating factor, that is, that the murder was committed "in the course of" the armed robbery . . .. This is so whether the defendant has been convicted of armed robbery . . ., or of attempted armed robbery. It is establishing that the murder was committed "in the course of" the armed robbery in our case that makes the defendant eligible for the death penalty, not the commission of an armed robbery or an attempted armed robbery. . . .

(Citations omitted.) *Walker*, 91 Ill. 2d at 510-11. The law in *Walker* was subsequently approved and followed. *See People v. Ramirez*, 98 Ill. 2d 439, 457 N.E.2d 31 (1983); *People v. Free*, 112 Ill. 2d 154, 492 N.E.2d 1269, *cert. denied*, 479 U.S. 871 (1986).

We disagree with Brett's assertion that *People v. Chandler*, 129 Ill. 2d 233, 543 N.E.2d 1290 (1989) indicates Illinois' reversal of its position. *Chandler* holds the failure to include a particular crime (residential burglary) in the list of enumerated crimes triggering the death penalty renders the death sentence invalid. Here, there is no argument robbery in the first degree is not listed in RCW 10.95.020(9). Whether Brett commits or attempts to commit robbery is not the relevant issue under the statute. The death penalty may be imposed if a premeditated murder is committed "in the course of" or "in furtherance of" robbery in the first degree.

■ We also disagree with Brett's remaining challenges. First, RCW 10.95.020(9) is not ambiguous requiring an interpretation in Brett's favor under the rule of lenity. Brett's interpretation is not reasonable because it would render superfluous the "in the course of, in furtherance of" language in the statute. *See State v. McGee*, 122 Wn.2d 783, 787, 864 P.2d 912 (1993).

■ Second, allowing uncompleted felonies listed in RCW 10.95.020(9) to constitute aggravating circumstances does narrow the class of death-eligible defendants and provide sufficient guidance to juries as to what constitutes an aggravating circumstance. *See Godfrey v. Georgia*, 446 U.S. 420, 64 L. Ed. 2d 398, 100 S. Ct. 1759 (1980). The class includes those persons who commit premeditated murders "in the course of, in furtherance of, or in immediate flight from" one of the listed felonies. The jury was so instructed and returned a special verdict finding Brett guilty of each alleged aggravating circumstance.

■ Lastly, we have previously rejected the contention that the robbery aggravator merges into the kidnapping aggravator because the intent to facilitate the commission of robbery elevates the crime to kidnapping in the first degree. *See* RCW 9A.40.020; *In re Fletcher*, 113 Wn.2d 42, 776 P.2d 114 (1989).

> [RCW 9A.40.020] only requires proof of *intent* to commit various acts, some of which are defined as crimes elsewhere in the criminal code. It does not require that the acts actually be committed. . . . Thus, the Legislature has not indicated that a defendant must also commit another crime in order to be guilty of first degree kidnapping, and therefore the merger doctrine does not apply. As a result, Fletcher may be punished separately for the kidnapping and robbery convictions.

*Fletcher*, 113 Wn.2d at 52-53.

We hold the trial court did not err in submitting the robbery aggravator to the jury. RCW 10.95.020(9) does not require a listed felony be completed in order to constitute an aggravating circumstance and there was sufficient evidence

the murder was committed in the course of robbery in the first degree for the jury to consider that aggravator.

9. Kidnapping Aggravator.

██ Brett asserts there was insufficient evidence to support the special verdict that the murder was committed in the course of kidnapping in the first degree. The court reviews a challenge to the sufficiency of the evidence in the light most favorable to the nonmoving party to determine whether any rational trier of fact could have found guilt beyond a reasonable doubt. *See State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980).

The kidnapping statute provides:

> A person is guilty of kidnapping in the first degree if he intentionally abducts another person with intent:
>
> . . . .
>
> (b) To facilitate commission of any felony or flight thereafter; or
>
> (c) To inflict bodily injury on him[.]

RCW 9A.40.020(1). The jury was instructed on the definition of "abduct" as follows:

> Abduct means to restrain a person by using or threatening to use deadly force. Restrain means to restrict a person's movements without consent and without legal authority in a manner which interferes substantially with that person's liberty. Restraint is without consent if it is accomplished by physical force, intimidation or deception.

Instruction 25; Clerk's Papers, at 490.

Brett argues there was no "abduction" because the restraint was incidental to the murder, and the kidnapping merged into the robbery. This court has held and the State concedes that the mere incidental restraint and movement of the victim during the course of another crime which has no independent purpose or injury is insufficient to establish a kidnapping. *See Green*, 94 Wn.2d at 227 (kidnapping merges into first degree rape); *State v. Johnson*, 92 Wn.2d 671, 680, 600 P.2d 1249 (1979) (kidnapping merges into first degree rape), *cert. dismissed*, 446 U.S. 948 (1980). *See also State v. Allen*, 94 Wn.2d 860, 862-64, 621 P.2d 143 (1980).

There is sufficient evidence in the record, however, to sustain the jury's verdict that the murder was committed "in the course of, or in furtherance of" first degree kidnapping. The jury had before it evidence that Brett and Martin planned to kidnap well-to-do older victims, take them to a bank, and later kill them. The pair obtained items to facilitate the planned kidnapping, picked a residence at random, and forced their way into the Milosevich home. The jury could rationally have found Brett and Martin were "in the course of" a kidnapping when the plan went awry, and Brett murdered Mr. Milosevich.

Viewing the evidence most favorable to the State, there was sufficient evidence for a rational trier of fact to find Brett guilty beyond a reasonable doubt of the kidnapping aggravator.

### 10. Concealment Aggravator.

■ Brett also contends there was insufficient evidence for any rational jury to find the murder was committed to conceal the identity of the perpetrator because Mrs. Milosevich was not also killed. The concealment aggravator is established if "the jury is presented with evidence which suggests that the killing was *intended* to postpone for a significant period of time the discovery of the commission of the crime . . .". (Italics ours.) *State v. Bartholomew*, 98 Wn.2d 173, 214, 654 P.2d 1170 (1982) (*Bartholomew* I), *State's cert. granted and remanded*, 463 U.S. 1203, *defendant's cert. denied*, 463 U.S. 1212 (1983), *reaff'd after remand*, 101 Wn.2d 631, 683 P.2d 1079 (1984) (*Bartholomew* II).

Here, Martin testified Brett felt masks were not needed because there would be no survivors. Although this intent may not have been successfully carried out, there was evidence of such intent. There was also evidence indicating Brett intended to kill both victims but was thwarted because Mrs. Milosevich ran out the front door.

When the evidence is viewed in the light most favorable to the State, a rational trier of fact could find Brett in-

tended to commit the murder in order to conceal the robbery and his identity beyond a reasonable doubt.

■ Brett also asserts the concealment, if any, either merged into the murder or the aggravators of robbery, kidnapping, and burglary. Brett argues the concealment "inheres in the overall plan to kill with premeditated intent for purposes of committing a robbery/kidnap/burglary". Br. of Appellant, at 111. Brett cites no authority for this proposition. *Intent* to conceal a crime or the identity of the perpetrator does not "inhere" in premeditated murder, robbery, kidnapping, or burglary. It is a separate intention from an intent to kill, or from the intent necessary for a robbery, burglary, or a kidnapping.

11. Use of Multiple Aggravators.

Brett asserts the use of more than one aggravating circumstance violates due process, double jeopardy, and the "same criminal conduct" rule, and constitutes cruel and unusual punishment.

*Due Process and Cruel Punishment.*

Brett argues that allowing the jury to consider the same "indivisible course of conduct" to constitute more than one aggravating factor violates due process and constitutes cruel punishment under Const. art. 1, §§ 3 and 14. Brett cites no Washington cases in support of this proposition, and it is not persuasive. *See People v. Harris*, 36 Cal. 3d 36, 63, 679 P.2d 433, 449, 201 Cal. Rptr. 782, *cert. denied*, 469 U.S. 965 (1984); *Provence v. State*, 337 So. 2d 783 (Fla. 1976), *cert. denied*, 431 U.S. 969 (1977); *White v. State*, 403 So. 2d 331 (Fla. 1981), *cert. denied*, 463 U.S. 1229 (1983); *Herzog v. State*, 439 So. 2d 1372 (Fla. 1983); *State v. Henderson*, 109 N.M. 655, 661, 789 P.2d 603, 609 (1990); *Engberg v. Meyer*, 820 P.2d 70, 89 (Wyo. 1991) (Cardine, J., concurring). *See also Cook v. State*, 369 So. 2d 1251, 1256 (Ala. 1978); *State v. Goodman*, 298 N.C. 1, 29, 257 S.E.2d 569, 587 (1979).

■ In Florida, New Mexico, North Carolina, and Alabama, the courts have invalidated the "doubling up" of aggra-

vators when those aggravators are based on the same *aspect* of the defendant's conduct. For example, in *Provence v. State, supra*, the court held the aggravating circumstances of "murder in the commission of a robbery" and "murder for pecuniary gain" could not validly be considered as two separate aggravating circumstances. Similarly in Wyoming, the court held the underlying robbery of defendant's felony murder conviction could not be used as an aggravating circumstance. *Engberg v. Meyer, supra. But see Blystone v. Pennsylvania*, 494 U.S. 299, 108 L. Ed. 2d 255, 110 S. Ct. 1078 (1990) (felony element of felony murder can be a valid aggravating factor). Here, the robbery, burglary, and kidnapping are not based on the same aspect of Defendant's conduct nor are the aggravators elements of premeditated first degree murder.

Harris is also distinguishable. The *Harris* court rejected the doubling up of the robbery and burglary aggravators because the California death penalty statute in effect when the defendant was sentenced specified that " '[i]n determining the penalty the trier of fact shall take into account . . . [t]he circumstances of the crime . . . and *the existence of any special circumstances found to be true . . ..*' " *Harris*, 36 Cal. 3d at 65 (quoting former Cal. Penal Code § 190.3). The court felt that allowing the jury to take into account the crime *and* the aggravating circumstances "artificially inflated" the defendant's conduct. *Harris*, 36 Cal. 3d at 62.

Washington's death penalty statute and the jury instructions in this case, however, instruct the jury to "[h]av[e] in mind the crime of which the defendant has been found guilty . . .". RCW 10.95.060(4). The jury is not instructed to consider the crime and separately consider the aggravating factors. Rather, the aggravators describe the circumstances of the "crime" for which Brett was found guilty.

*Double Jeopardy.*

Brett contends the failure of the court to merge the aggravators into the robbery aggravator violates double jeopardy.

In *State v. Laviollette*, 118 Wn.2d 670, 675-76, 826 P.2d 684 (1992), this court adopted a 2-step test to determine whether multiple punishments are being exacted for the same offense: (1) the elements of each offense are identical or one is a lesser included offense of the other; or (2) in order to prove an essential element of the offense charged, the State relies on conduct that constitutes an offense for which the defendant has already been prosecuted. Brett argues the second prong is present in this case because the evidence used to prove the robbery aggravator was also used to establish the kidnapping aggravator.

Here, the State need not prove the completed crimes to establish the robbery and kidnapping aggravating circumstances. The State is required to prove only that the murder was committed "in the course of" those crimes. Therefore, the robbery and kidnapping aggravators are not "charged offenses" for purposes of double jeopardy. In addition, Brett had not "already been prosecuted" on any of the aggravators. There was no double jeopardy violation.

*Same Criminal Conduct Rule.*

Brett argues allowing the jury to find him guilty of multiple aggravating circumstances arising out of the same conduct violates the "same criminal conduct" rule in RCW 9.94A.400(1)(a) and *State v. Dunaway*, 109 Wn.2d 207, 743 P.2d 1237 (1987). This argument is not persuasive.

Aggravating factors are sentence enhancements; they are not "crimes", as such. *Cf. State v. Kincaid*, 103 Wn.2d 304, 312-13, 692 P.2d 823 (1985) (aggravating factors are not elements of first degree murder). Thus, the same criminal conduct provision does not apply to aggravating factors. Moreover, even if applicable, the aggravators of burglary, robbery, kidnapping, and concealment do not require the same objective criminal intent. *See Dunaway*, 109 Wn.2d at 216 (intent behind robbery distinct from intent behind attempted murder); *State v. Lessley*, 118 Wn.2d 773, 778, 827 P.2d 996 (1992) ("burglary and kidnapping are not the same criminal conduct because the intent was not the same for both crimes."). In

addition, there were multiple victims of the robbery, kidnapping, and burglary aggravators: both Mr. and Mrs. Milosevich. Multiple crimes against multiple victims are not considered to be the same criminal conduct. *Lessley*, 118 Wn.2d at 779. Because we find the same criminal conduct rule inapplicable by its terms, we need not address whether the procedural rules in the Sentencing Reform Act of 1981 (SRA) (RCW 9.94A) apply to capital cases.

The trial court did not err in refusing to merge all the aggravators into the robbery aggravator.

Because we find the aggravating factors valid, we need not address Brett's assertion that the death penalty violates due process, the Eighth Amendment, or Const. art. 1, § 14 when based on invalid aggravators.

12. Instructional Errors.

Brett challenges instructions 9, 13, and 20, alleging they relieved the State of its burden of proof and jeopardized the requirement of jury unanimity. These issues may be raised for the first time on appeal. *See State v. Hanson*, 59 Wn. App. 651, 800 P.2d 1124 (1990).

The court reviews instructional errors de novo. *See State v. Benn*, 120 Wn.2d 631, 654-55, 845 P.2d 289, *cert. denied*, 114 S. Ct. 382 (1993). The court must evaluate each instruction "in the context of the instructions as a whole". *Benn*, 120 Wn.2d at 655.

Brett argues instruction 9 relieved the State of its burden of proof because it allowed the jury to find him guilty on both alternatives, felony murder, and premeditated murder, if it found him guilty on either alternative. We disagree.

Instruction 9 lists the elements for premeditated first degree murder in alternative A and the elements for felony murder in alternative B, then provides:

> If you find from the evidence that each of the elements in Alternative A or each of the elements in Alternative B has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. All of the elements of only one alternative need be proved. You must unanimously agree

as to which one or more of the alternatives, A or B, has been proved beyond a reasonable doubt.

On the other hand, if after weighing all of the evidence, you have a reasonable doubt as to any one of the elements in Alternative A, or as to any one of the elements in Alternative B, then it will be your duty to return a verdict of not guilty *on that alternative*.

(Italics ours.) Clerk's Papers, at 471-72. This instruction is not misleading. The jury is expressly informed to reach a decision as to each alternative.

Next, Brett asserts instruction 13 allowed the jury to find the aggravator of robbery in the first degree without a finding that a "taking" occurred, as required by RCW 9A.56.190. Instruction 13 provides:

A person commits the crime of Robbery in the First Degree when in the commission of a robbery or in immediate flight therefrom he or she is armed with a deadly weapon or displays what appears to be a firearm or other deadly weapon or inflicts bodily injury.

Clerk's Papers, at 476.

Brett argues this instruction relieved the State of its burden to prove every element of the crime beyond a reasonable doubt in violation of the due process clause of the Fourteenth Amendment. *See State v. Colwash*, 88 Wn.2d 468, 470, 564 P.2d 781 (1977).

The instructions, taken as a whole, did inform the jury of the "taking" element. *See Benn*, 120 Wn.2d at 655. Instruction 13 must be read in conjunction with instruction 14, which sets forth the elements of robbery, including the taking element. Taken together, the instructions were proper.

As we have held, however, the issue before the jury was not whether a robbery was completed, but whether the murder was committed "in the course of" the robbery.

Brett also argues instruction 20 misleads the jury and jeopardizes the requirement of jury unanimity on each alternative aggravating circumstance. Instruction 20 provides:

You will be furnished with all the exhibits admitted into evidence and Verdict Forms "A" and "B".

You must fill in the blank provided for the crime of Murder in the First Degree with the words "not guilty" or the word "guilty", according to the decision you reach. You must also fill in the words "yes" or "no" in the appropriate space provided, as to which alternative of the crime of Murder in the First Degree the State has proved beyond a reasonable doubt. If the State has proved both alternatives beyond a reasonable doubt, fill in both spaces with the word "yes".

Since this is a criminal case, each of you must agree for you to return a verdict. When all of you have so agreed, fill in Verdict Form "A" to express your decision. The foreman will sign it.

If and only if you find the defendant guilty of Premeditated First Degree Murder as set forth in Alternative A, in Instruction No. 9 then it will be necessary for you to return a special verdict to the following question:

Did the State prove beyond a reasonable doubt that one or more of the following aggravating circumstances existed?

(a) The defendant committed the murder to protect or conceal the identity of any person committing the crime;

(b) [T]he murder was committed in the course of or in furtherance of Robbery in the First Degree;

(c) The murder was committed in the course of, in furtherance of, or in immediate flight from the crime of Burglary in the First Degree;

(d) The murder was committed in the course of, in furtherance of, or in immediate flight from the crime of Kidnapping in the First Degree.

The State has the burden to prove beyond a reasonable doubt, as previously defined, one or more of the above-listed aggravating circumstances. These aggravating circumstances are alternatives and only one need be proved in order to convict the defendant of aggravated murder in the first degree. You must unanimously agree upon which, if any, of the aggravating circumstances set forth before has been proved beyond a reasonable doubt. You will be provided with a Special Verdict Form "B" for each aggravating circumstance in which you answer "yes" or "no" according to the decision you reach.

If, after fully and fairly considering all of the evidence or lack of evidence you are not able to reach a unanimous decision as to any element of any one of the aggravating circumstances, *do not fill in the blank for that alternative.*

When all of you have so agreed, have the foreman sign Verdict Form "B" and notify the bailiff, who will conduct you into court to declare your verdict.

(Italics ours.) Clerk's Papers, at 483-85.

The second to the last paragraph clearly informs the jury that if a unanimous decision on each element of an alternative cannot be reached then it is not to "fill in the blank *for that alternative*." (Italics ours.) There was no error.

Brett also asserts instructions 24 and 25 misstate the law of kidnapping by failing to inform the jury that a minimal restraint or asportation incidental to a homicide is insufficient to constitute an abduction. *See State v. Green*, 94 Wn.2d 216, 616 P.2d 628 (1980). Instruction 24 provides:

> A person commits the crime of Kidnapping in the First Degree when he or she intentionally abducts another person with intent to facilitate the commission of any felony, or to inflict bodily injury on the person.

Clerk's Papers, at 489; RCW 9A.40.020(1). Instruction 25 defines "abduct" and "restraint" as provided in RCW 9A.40.010(1) and (2):

> Abduct means to restrain a person by using or threatening to use deadly force. Restraint means to restrict a person's movements without consent and without legal authority in a manner which interferes substantially with that person's liberty. Restraint is without consent if it is accomplished by physical force, intimidation or deception.

Clerk's Papers, at 490.

Brett failed to object to these instructions at trial. He raises the issue for the first time on appeal asserting a constitutional error that the instructions failed to set forth an essential element of kidnapping, lack of incidental restraint. *See State v. Scott*, 110 Wn.2d 682, 690, 757 P.2d 492 (1988). Incidental restraint, however, is not an element of kidnapping. Rather, the nature of the restraint determines whether the kidnapping will merge into a separate crime to avoid double jeopardy. *See Green*, 94 Wn.2d at 227; *State v. Johnson*, 92 Wn.2d 671, 681, 600 P.2d 1249 (1979), *cert. dismissed*, 446 U.S. 948 (1980). Brett raises the merger issue in a separate assignment of error.

13. Prosecutorial Misconduct.

Allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard. *State v.*

*Hughes*, 106 Wn.2d 176, 195, 721 P.2d 902 (1986). The defendant bears the burden of "establishing both the impropriety of the prosecutor's conduct and its prejudicial effect." (Footnote omitted.) *State v. Furman*, 122 Wn.2d 440, 455, 858 P.2d 1092 (1993). Prosecutorial misconduct does not constitute prejudicial error unless the appellate court determines there is a substantial likelihood the instances of misconduct affected the jury's verdict. *State v. Evans*, 96 Wn.2d 1, 5, 633 P.2d 83 (1981).

*Vouching for Credibility.*

Brett argues the prosecutor improperly vouched for the credibility of Mrs. Milosevich during his closing argument. It is improper for a prosecutor personally to vouch for the credibility of a witness. *State v. Sargent*, 40 Wn. App. 340, 344, 698 P.2d 598 (1985). Prosecutors may, however, argue an inference from the evidence, and prejudicial error will not be found unless it is "clear and unmistakable" that counsel is expressing a personal opinion. *Sargent*, 40 Wn. App. at 344.

In speaking to the jury about the discrepancy between Mrs. Milosevich's and Shirley Martin's testimony as to whether the alarm went into full alarm mode, the prosecutor argued:

> And you're going to have to evaluate credibility on that issue I guess. But I would suggest that one reason you might want to believe Pat Milosevich on that issue is that she at the time those events were occurring was watching her husband of 33 years being blown away by a .410 shotgun. And maybe that's the kind of scenario of events that she's going to remember fairly well for the rest of her life. . . .

Report of Proceedings vol. 14 (June 11, 1992), at 25-26. This argument does not set forth a statement of personal belief, as was done in *Sargent* when the prosecutor stated, "*I believe Jerry Lee Brown. I believe him . . .*". *Sargent*, 40 Wn. App. at 343. Rather, the prosecutor was drawing an inference from the evidence as to why the jury would want to believe one witness over another. This statement was not improper.

*Comment on Failure To Testify.*

 Brett asserts the prosecutor indirectly commented on Brett's failure to testify in violation of his right to remain silent and to due process. *See State v. Belgarde,* 110 Wn.2d 504, 511, 755 P.2d 174 (1988); *State v. Evans,* 96 Wn.2d 1, 633 P.2d 83 (1981). Brett did not object to the challenged statements at trial. If defense counsel fails to object, move for a mistrial, or request a curative instruction, then allegations of improper argument will not be heard on appeal unless the comments are "so flagrant and ill intentioned that no curative instruction could have obviated the prejudice they engendered.'" *State v. Dunaway,* 109 Wn.2d 207, 221, 743 P.2d 1237 (1987) (quoting *State v. Kendrick,* 47 Wn. App. 620, 638, 736 P.2d 1079 (1987)). Comments by a prosecutor that certain testimony is undenied are not improper as long as there is no reference to who may be in a position to deny it. *See State v. Ashby,* 77 Wn.2d 33, 38, 459 P.2d 403 (1969); *State v. Crawford,* 21 Wn. App. 146, 584 P.2d 442 (1978).

"Surely the prosecutor may comment upon the fact that certain testimony is undenied . . .; and, if that results in an inference unfavorable to the accused, he must accept the burden, because the choice to testify or not was wholly his". . . .

*Ashby,* 77 Wn.2d at 38 (quoting *State v. Litzenberger,* 140 Wash. 308, 311, 248 P. 799 (1926)). Prosecutors may also comment on the defendant's failure to present evidence on a particular issue if persons other than the accused could have testified as to that issue. *Ashby,* 77 Wn.2d at 38.

Brett asserts the standards set forth in *Ashby, Crawford,* and *Litzenberger* are no longer viable because they were decided prior to *Doyle v. Ohio,* 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). We disagree. *Doyle* held that a defendant's postarrest silence could not be used to impeach a defendant's exculpatory explanation subsequently given at trial. *Doyle* does not alter the standard for determining what types of comments by a prosecutor violate a defendant's due process rights. The defendant's citation to *State v.*

*Fricks*, 91 Wn.2d 391, 588 P.2d 1328 (1979) and *State v. Evans, supra*, are also unpersuasive. Neither case addresses the standards set forth in *Ashby, Crawford*, or *Litzenberger* for determining when a comment on the lack of evidence is improper.

Brett challenges the following statements from the prosecutor's closing argument:

> There is absolutely no evidence in this case that that gun was ever jolted, was ever touched, was ever in any way moved to cause the gun to be accidentally discharged. There's no evidence of that.

Report of Proceedings vol. 14 (June 11, 1992), at 27.

> Counsel also said it's possible and feasible that the defendant used that type of a needle to inject himself [with insulin]. Whether it's plausible or feasible, there's no evidence of that. And the evidence from Mr. Eales is directly to the contrary, that in the tens of thousands of cases where he's watched people inject themselves they'd never used that kind of needle. If you were to judge this case on the evidence, that being plausible and feasible is not part of the evidence.

Report of Proceedings vol. 14 (June 11, 1992), at 62.

In response to a potential suggestion by Brett that the killing was accidental, the prosecutor stated:

> Mr. Brett could have offered aid . . . he could have at least run out. He could have just said, oh, what have I done and run out of that residence. Shirley, let's get out of here, a gun went off. Could have called 9-1-1. Could have done that anonymously. Come to this residence, somebody got shot, let's get out of here Shirley. But what did he do? He took his weapon, and as Ken Milosevich was begging for his life as Shirley said . . . James Brett says you're going to die . . .. That . . . is premeditation.

Report of Proceedings vol. 14 (June 11, 1992), at 30.

The first two arguments state there is no evidence the shotgun was accidentally discharged or that Brett used the larger needles obtained from his friend to inject himself with insulin. There were other potential witnesses who could have testified as to these issues. Shirley Martin and Pat Milosevich could have testified if the first shot was due to an accidental discharge. Likewise, Martin or any number

of other people could conceivably have known that Brett used the larger needles for his daily insulin injections. *See Ashby*, 77 Wn.2d at 37-38. The third argument also is not an impermissible comment on Brett's failure to testify. The prosecutor is asserting Brett's actions are inconsistent with a person who has accidentally fired a shotgun and are consistent with premeditation.

### Comment on Guilt.

Brett contends the prosecutor improperly commented on Brett's guilt when he stated the felony murder conviction was a "slam dunk". Report of Proceedings vol. 14 (June 11, 1992), at 16. *See State v. Reed*, 102 Wn.2d 140, 145, 684 P.2d 699 (1984). Brett did not object to this statement at trial. In addition, when taken in context, the comment was not the expression of the prosecutor's personal opinion, but a recognition that Brett had conceded liability on the felony murder charge. The prosecutor first told the jury:

> With respect to the Felony Murder charge, ladies and gentlemen, I'm not going to spend much time talking about that. Because as you know from the jury selection process, the defense has conceded liability. . . .

Report of Proceedings vol. 14 (June 11, 1992), at 14. Then, the prosecutor stated, "Felony Murder is not an issue for your consideration. I guess in the basketball vernacular it's a slam dunk." Report of Proceedings vol. 14 (June 11, 1992), at 16. The comment was not improper under the circumstances of this case.

### Robbery Aggravator.

Brett objected to the State's argument that the robbery aggravator could be found even if the evidence failed to establish a "taking". The prosecutor's argument was in accordance with the trial judge's ruling on this issue and with our holding in this case. There was no error.

### Law of Kidnapping.

Brett argues the prosecutor's closing argument on the law of kidnapping was in error and prejudicial because it failed to

inform the jury that a minimal detention which is incidental to a homicide is not considered a kidnapping. *See State v. Green*, 94 Wn.2d 216, 616 P.2d 628 (1980). Defense counsel had ample opportunity to object or request any needed curative instruction. As in *Dunaway*, appellate review is precluded because any prejudice could have been cured by an instruction to the jury. *Dunaway*, 109 Wn.2d at 221.

*Passion and Prejudice.*

Brett alleges a number of comments by the prosecutor inflamed the jury with passion and prejudice. Appeals to jury passion are inappropriate. *State v. Belgarde*, 110 Wn.2d 504, 755 P.2d 174 (1988).

Brett first cites to the prosecutor's argument that the jury should believe Mrs. Milosevich's memory of the events because at the time she was "watching her husband of 33 years being blown away by a .410 shotgun." Report of Proceedings vol. 14 (June 11, 1992), at 25. We agree with the trial court's assessment in overruling Brett's objection.

> As far as the tone and tenor of the argument, I do not feel as a whole that it did violate the motion in limine. I felt that Mr. Curtis was quite restrained. . . .

Report of Proceedings vol. 14 (June 11, 1992), at 37.

Brett also contends the prosecutor inflamed the jury while arguing the second shot was premeditated.

> [A]nd I suggest . . . that *if you get back in the jury room and even think that wasn't it nice of Mr. Brett not to shoot Pat Milosevich when she was running out of the residence, wasn't that nice of him*, remember he had to reload his gun and he had a choice to make because it's a one-shot weapon. . . . The choice was to reload that weapon and shoot him a second time. It took more than a moment in point of time to reload that weapon.

(Italics ours.) Report of Proceedings vol. 14 (June 11, 1992), at 27.

Lastly, Brett asserts the State's rebuttal remarks in response to defense counsel's suggestion that Mr. Milosevich moved toward the gun were inflammatory.

Again, the evidence is uncontroverted that Pat Milosevich says her husband was moving away from the gun, . . . there's no evidence that Mr. Milosevich touched the gun or in any way had anything to do with that gun. And *so what? Even if he did move toward the gun, it's his house. His privacy is being invaded. He and his wife are being robbed. What does that make it? Self-defense?* Defendant has a right to shoot Mr. Milosevich because he's moving toward the gun? I suggest the evidence is not there to suggest he moved toward the gun. But even if he did, has nothing to do with whether or not Mr. Brett premeditatedly and intentionally pulled that trigger the first time, let alone the second time.

(Italics ours.) Report of Proceedings vol. 14 (June 11, 1992), at 63.

These are not the type of comments which this court has held to be inflammatory. *See, e.g., Belgarde,* 110 Wn.2d at 506-07 (prosecutor stated the American Indian group with which defendant was affiliated was "*a deadly group of madmen*" and "*butchers*", and told them to remember "*Wounded Knee, South Dakota*"); *State v. Reed,* 102 Wn.2d 140, 143-44, 684 P.2d 699 (1984) (prosecutor said defendant was a liar four times, stated defense had no case, said the defendant was a "*murder two*", and implied the defense witnesses should not be believed because they were from out of town and drove fancy cars).

In this case, the prosecutor was making arguments based on evidence adduced at trial. Brett has failed to meet his burden to establish that these comments were improper or that there is a substantial likelihood the jury verdict was affected thereby.

14. Double Jeopardy.

Brett argues his convictions of both first degree felony murder and aggravated first degree murder constitute successive prosecutions for the same criminal conduct and violate the double jeopardy clause of the federal constitution. *See* U.S. Const. amend. 5.

There is a 2-part test to determine whether a defendant has been unconstitutionally subjected to successive prosecutions for the same offense. *See State v. Laviollette,* 118

Wn.2d 670, 676, 826 P.2d 684 (1992) (citing *Grady v. Corbin*, 495 U.S. 508, 109 L. Ed. 2d 548, 110 S. Ct. 2084 (1990)). Double jeopardy is violated if (1) the charged offenses have identical statutory elements or one is a lesser included offense of the other, and (2) "conduct that constitutes an offense for which the defendant has already been prosecuted" will be used to establish an essential element of an offense charged in a subsequent prosecution. *Laviollette*, 118 Wn.2d at 676 (quoting *Grady*, 495 U.S. at 521).

 Here, there is no violation of double jeopardy. First degree felony murder is not a lesser included offense of aggravated first degree murder. *See State v. Irizarry*, 111 Wn.2d 591, 592-96, 763 P.2d 432 (1988). Aggravated first degree murder and first degree felony murder do not have identical statutory elements. *Compare* RCW 9A.32.030(1)(a) *and* RCW 10.95.020 *with* RCW 9A.32.030(1)(c).

We decline to reach Brett's claim under the state constitution because he fails to make any argument thereunder. *See Tellevik v. 31641 W. Rutherford St.*, 120 Wn.2d 68, 77, 838 P.2d 111, 845 P.2d 1325 (1992).

15. Felony Murder Conviction.

Brett contends his rights to due process and equal protection were violated by the trial court's failure either to impose sentence on the felony murder conviction prior to the penalty phase or inform the jury on the range of sentences on that offense during the penalty phase. *See State v. Henderson*, 109 N.M. 655, 789 P.2d 603 (1990). Brett argues this deprived him of the opportunity to use his admission of guilt and the sentence imposed as a potential mitigating factor.

 Brett's argument is not persuasive. The cited language in *Henderson* was dicta and placed the responsibility on the defendant to request the sentence or instruction on the collateral noncapital offense. *Henderson*, 109 N.M. at 658-59.

Brett never requested the trial court to sentence him on the felony murder conviction nor attempted to admit the sen-

tencing range during the sentencing hearing. In addition, the defense informed the jury, starting with voir dire, that Brett accepted responsibility for Mr. Milosevich's death and, during closing, urged the jury to find Brett guilty of felony murder rather than premeditated murder. The defense had every opportunity to use Brett's admission of guilt as a mitigating factor.

Brett also contends he had a statutory right to proceed to sentencing within 40 days after he attempted to plead guilty to felony murder under the first amended complaint pursuant to RCW 9.94A.110, which provides:

> Before imposing a sentence upon a defendant, the court shall conduct a sentencing hearing. The sentencing hearing shall be held within forty court days following conviction. . . .

This argument is without merit. As discussed in issue 2, Brett did not have an absolute right to plead guilty to the first amended information. RCW 9.94A.110 was not triggered at that time. The trial court properly sentenced Brett on the premeditated murder in the first degree with aggravated circumstances and need not have sentenced him on the felony murder as the time would run concurrently. *See* RCW 9.94A.400.

## ANALYSIS

### PENALTY PHASE

■ This court reviews claimed errors associated with the sentencing phase of a capital case under heightened scrutiny. *State v. Lord*, 117 Wn.2d 829, 888, 822 P.2d 177 (1991) (citing *Johnson v. Mississippi*, 486 U.S. 578, 584, 100 L. Ed. 2d 575, 108 S. Ct. 1981 (1988)), *cert. denied*, 113 S. Ct. 164 (1992). Heightened scrutiny requires "a closer, more careful review of the record, it does not entail a raised standard of review." *State v. Benn*, 120 Wn.2d 631, 648, 845 P.2d 289, *cert. denied*, 114 S. Ct. 382 (1993).

16. Criminal History.

Brett asserts it was error to admit, during the penalty phase, evidence of his juvenile adjudications and adult criminal convictions as nonstatutory aggravators.

*Adult Criminal Convictions.*

Brett argues admittance of his prior criminal convictions, while constitutionally valid, is not statutorily authorized because Washington's death penalty statute does not expressly refer to nonstatutory aggravators. *See Zant v. Stephens*, 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983) (Georgia death penalty statute provides for statutory aggravators and aggravators "otherwise authorized by law"). *See also Geralds v. State*, 601 So. 2d 1157 (Fla. 1992); *Wike v. State*, 596 So. 2d 1020 (Fla. 1992) (similar Florida death penalty statute interpreted to exclude prior criminal convictions as nonstatutory aggravating circumstances). Brett contends this court improperly held prior criminal convictions were admissible as nonstatutory aggravators in the penalty phase. *See Bartholomew* I; *Bartholomew* II.

Washington's death penalty statute, however, authorizes the jury to consider a defendant's prior criminal history in the penalty phase. RCW 10.95.070(1) provides:

> In deciding the question posed by RCW 10.95.060(4), the jury . . . may consider any relevant factors, including but not limited to the following:
>
> (1) Whether the defendant has or does not have a significant history, either as a juvenile or an adult, of prior criminal activity[.]

We find no support for Brett's contention this provision may only be used as a shield to rebut an assertion that the defendant lacks a significant criminal history, not as a sword when the defendant makes no such assertion. The statute expressly states the jury "may consider" a defendant's criminal history in determining whether there are sufficient mitigating circumstances to merit leniency. *See Bartholomew* II, at 642-43; *Lord*, 117 Wn.2d at 896-97. We also are not persuaded admission of prior convictions must be subject to a balancing test under ER 403 and 404. We have previously indicated and now establish that admission of prior convictions does not necessitate a balancing test because such evidence is "reasonably objective" and "reli-

able". *Bartholomew* I, at 196. We adhere to our decisions in *Bartholomew* I and *Bartholomew* II.

*Juvenile Adjudications.*

 Brett argues the use of his juvenile adjudications in the sentencing proceeding was prejudicial. This argument is without merit. RCW 10.95.070(1) expressly provides the penalty phase jury may consider a defendant's juvenile record. *See Lord*, 117 Wn.2d at 896-97.

 Brett also argues juvenile adjudications which occur prior to age 15 are inadmissible in the penalty phase because the SRA excludes those convictions from being considered by a sentencing judge in a normal felony case. *See* RCW 9.94A.360(4); RCW 9.94A.030(12). The SRA, however, does not govern the sentencing of capital defendants.

The SRA and RCW 10.95 serve two separate functions and are consistent. *See State v. Kron*, 63 Wn. App. 688, 694, 821 P.2d 1248, *review denied*, 119 Wn.2d 1004 (1992). The SRA is a determinate sentencing system for felony offenders. It gives first degree aggravated murder a seriousness score of 15 and provides for two possible sentences, life without parole or death. The statute, however, does not purport to govern or guide penalty phase juries in their sentencing decisions. This function is served by RCW 10.95, which guides and channels the jury's discretion in reaching an individualized sentencing decision for each defendant convicted of a capital offense.

The use of pre-age-15 juvenile convictions is consistent with this purpose because, along with evidence of mitigating circumstances, it provides the jury a broader understanding of the defendant's background and character. *Cf. State v. McAlpin*, 108 Wn.2d 458, 740 P.2d 824 (1987) (prior juvenile conviction excluded by SRA for calculation of standard range may be used to impose exceptional sentence). This court has held the admission of a defendant's prior criminal convictions is not prejudicial because the information is objective and reliable. *Bartholomew* I, at 196. This

rationale applies equally to pre-age-15 juvenile adjudications.

Lastly, Brett asserts that if this court holds RCW 9.94A.360 is inapplicable to the penalty phase of capital cases, then this exclusion violates equal protection under the state and federal constitutions. He argues that singling out aggravated murder defendants as the sole group to be excluded from RCW 9.94A.360 creates a statutory classification that does not meet the strict scrutiny test. *See State v. Rice*, 98 Wn.2d 384, 399-400, 655 P.2d 1145 (1982). This argument is not persuasive. The State certainly has a compelling interest to comply with the federal and state constitutions to ensure the death sentence is imposed only upon an individualized consideration of the crime and the defendant. Such individualized consideration includes a determination whether the defendant has "a significant history, either as a juvenile or an adult, of prior criminal activity[.]" RCW 10.95.070(1).

We hold the trial court did not err in allowing the State to introduce evidence of Brett's prior juvenile adjudications and adult convictions during the penalty phase.

17. Cross Examination of Defense Mitigation Witnesses.

*Details of Juvenile Convictions.*

Brett argues the prosecutor's cross examination of three defense mitigation witnesses violated due process by bringing out details of his juvenile convictions. He asserts the prejudicial effect of the evidence outweighed its rebuttal value. *See Bartholomew* II, at 642-43.

Rebuttal evidence offered by the prosecution will be admitted if "it is relevant to a matter raised in mitigation by defendant" and "the rebuttal value of the evidence outweighs the prejudicial effect . . .". *Bartholomew* II, 101 Wn.2d at 643 (quoting *Bartholomew* I, at 197-98). In *State v. Lord, supra*, the court adopted the balancing test set forth in ER 403 to determine whether prosecution rebuttal evidence is admissible in the penalty phase. *Lord*, 117 Wn.2d at 891. Under

this standard, " '[a]lthough relevant, [rebuttal] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . .' ". *Lord*, 117 Wn.2d at 891 (quoting ER 403). The court analogized this situation to the evidence rules concerning character evidence which allow a defendant's character witness to be cross-examined regarding personal knowledge of specific incidents of misconduct. *Lord*, 117 Wn.2d at 891.

> A character witness may not only be asked whether he "has heard" this or that about the defendant, but he may also be asked "Do you know" this or that about the defendant.

*Lord*, 117 Wn.2d at 891-92 (quoting 5 Karl B. Tegland, Wash. Prac., *Evidence* § 125, at 450 (3d ed. 1989)). The court concluded, "defense witnesses may be cross-examined concerning anything relevant to a matter raised in mitigation by the defendant, subject to the balancing test." *Lord*, 117 Wn.2d at 892. Applying this standard, the *Lord* court upheld the cross examination of a defense mitigation witness regarding the details of Lord's prior misconduct after that witness had testified that Lord "was a 'good boy'." *Lord*, 117 Wn.2d at 893-94.

In this case, the State's cross examination was relevant to rebut matters raised by the defense, and the probative value of this evidence was not "substantially outweighed" by its prejudicial effect.

Sandra Youngen, the program administrator with the Division of Juvenile Rehabilitation for the State of Washington at Maple Lane School testified on direct examination as follows:

Q: Based on all of your experiences with James Brett and this was over a period of years, you're aware that he has been involved in the taking of another person's life?

A: I am.

Q: When you were provided with that information, did you have any reaction? Did it surprise you?

A: Shocked me.

Q: Based on all your experiences with James, did you think he would ever have been capable of doing that?

A: No. Not taking someone's life, no.

Report of Proceedings vol. 16, at 26. On cross examination, the prosecutor elicited from Youngen that she was aware that as a result of an assault on a staff member at Echo Glen Children's Center that Brett was convicted of kidnapping in the first degree, assault in the second degree, and escape in the first degree. Then, the prosecutor queried:

Q: And [were you aware] that he [Brett] had snuck up on a staff counselor from behind, placed a tightly wound towel around her mouth and then moved the towel to her throat and strangled her with the towel? Were you aware of that? [Defense objection overruled.]

. . . .

Q: And that she was bound with electrical cord prior to Mr. Brett escaping?

A: I do recall something about her being bound, yes.

Report of Proceedings vol 16, at 28-29. Youngen then testified that her reaction of shock at Brett's conviction was based only upon his behavior during his stay at Maple Lane, not on his prior behavior. On redirect, the defense counsel brought up the Echo Glen incident again by asking Youngen whether other youth were involved.

Brett also alleges the trial court erred in allowing the prosecution to cross-examine Jeffrey Johnson and Dr. James Owens regarding the details of the Echo Glen assault.

Johnson was the associate superintendent at Maple Lane while Brett was at that facility. On direct, Johnson testified that Brett was not a threatening person. On cross, the prosecution asked Johnson if he was aware that Brett had previously been convicted of kidnapping, assault, and escape for assaulting a staff worker at Echo Glen and whether he knew the details of the assault. Johnson responded that he knew about the kidnapping but did not know about the strangulation attempt until being subpoenaed.

Dr. Owens was the medical director at Echo Glen Children's Center during the relevant time period. On direct, Dr. Owens testified he knew about the assault on a staff worker but still felt "[v]ery much" surprised about Brett's conviction. Report of Proceedings vol. 17, at 163. He also testified that he took Brett home to spend a day with his

wife and two sons. On cross examination, the prosecutor asked if Owens took Brett home before or after the assault. He also asked Owens if it was correct that the staff worker was "strangled with a towel". Owens replied that he understood that was how Brett "got control of her and her keys". Report of Proceedings vol. 17, at 166.

The evidence regarding the details of the incident at Echo Glen were relevant to rebut each mitigation witness' testimony that Brett was not a threatening person and/or that it was surprising that he took a person's life. Brett has not shown the probative value of this rebuttal evidence is "substantially outweighed" by its prejudicial effect. The jury was aware Brett had been convicted of 15 crimes since the age of 12. It was also aware of the violent nature of Mr. Milosevich's murder. Under "the totality of the circumstances presented to the jury, . . . no improper evidence was admitted." *Lord,* 117 Wn.2d at 895. "Unless the prosecution is permitted to rebut defendant's evidence, the jury may well approach the crucial sentencing decision with an incomplete picture." *Lord,* 117 Wn.2d at 894.

*Uncharged Criminal Activity.*

Brett also asserts the trial court erred in allowing the prosecution to cross-examine Gwen Blackmon regarding uncharged criminal activity engaged in by Brett and her son. Blackmon is the mother of Brett's codefendant in a 1983 robbery conviction. On direct, Blackmon testified that "James respected people" and that he was "a real gentleman". Report of Proceedings vol. 17, at 190. She also stated, "I would never have expected that from James. Burglary, yes. But murder, that's real hard for me to swallow." Report of Proceedings vol. 17, at 192. On cross examination, after questioning Blackmon about the 1983 robbery, the prosecutor asked if Brett and her son were "involved in any other crime together". Report of Proceedings vol. 17, at 193. Blackmon responded:

> A lot of small burglaries because they were unsupervised and running at night and they were — had no money, and a

lot of times I didn't see evidence of violence but I heard a lot of talk about it.

Report of Proceedings vol. 17, at 193.

 Uncharged criminal activities may not be presented to the jury as a nonstatutory aggravating factor. *Bartholomew* II, at 642. The prosecutor may, however, introduce evidence to rebut matters raised in mitigation by the defendant subject to the balancing test set forth in ER 403. *Bartholomew* II, at 642-43; *Lord*, 117 Wn.2d at 891.

Here, questions regarding Brett's uncharged criminal activity were relevant because they were used to rebut Blackmon's testimony that Brett "respected people" and "was a gentleman". The probative value of this testimony was not substantially outweighed by its prejudicial impact. The jury was aware of the murder committed by Brett and of his prior juvenile and adult convictions. The testimony was not cumulative or graphic in nature. In this context, the rebuttal value of the evidence outweighs its prejudicial impact. *See Lord*, 117 Wn.2d at 895.

*Fatalistic Beliefs.*

Brett asserts the prosecutor's cross examination of Sherry Brett, Brett's mother, regarding Brett's fatalistic beliefs violated his right to free religious expression under Const. art. 1, § 11, which provides:

> Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion[.]

During the penalty phase, Sherry Brett testified that Brett would have spells of depression and would become violent and self-destructive. On cross examination, the prosecutor followed up on this line of questioning.

Q: Mr. Foister also asked you about the fact that your son gets depressed, and you said that he gets violent and self destructive; is that correct?

A: Yes, he does.

Q: He also presents a rather fatalistic attitude about life; isn't that correct.

A: Like what? I don't understand what you're saying.

Q: Doesn't he get depressed about things and hasn't he made a statement to you at least once in the past that within 15 years the end of the world will be here?

A: Yes. I've heard him make that statement.

Report of Proceedings vol. 15, at 95. On redirect, defense counsel elicited testimony from Sherry Brett that her son's fatalistic belief was one of the teachings of the Jehovah's Witnesses, of which she and her son were followers.

Brett argues the prosecutor's questioning violated his absolute freedom to religious belief and allowed the jury to draw an adverse inference from his constitutionally protected behavior. *See State v. Rupe*, 101 Wn.2d 664, 704-05, 683 P.2d 571 (1984). Brett's argument is not persuasive.

First, impermissible use of constitutionally protected conduct is not a violation of Const. art. 1, § 11, it is a violation of due process. *See Rupe*, 101 Wn.2d at 706 (citing *Zant v. Stephens*, 462 U.S. 862, 885-86, 77 L. Ed. 2d 235, 103 S. Ct. 2733, 2747 (1983)). Brett does not allege such a violation. Second, in *Rupe*, the State's closing argument emphasized the defendant was a very dangerous man and deserved the death penalty because he owned a collection of firearms, including a semi-automatic rifle. *Rupe*, 101 Wn.2d at 703-04. Here, the State did not make an adverse inference based upon Brett's belief nor even address this belief in closing argument. *See Rupe*, 101 Wn.2d at 705 ("the State may not draw adverse inferences from the exercise of a constitutional right."). Under these circumstances, Brett's rights were not infringed.

18. Presumption of Leniency Instruction.

Brett contends the trial court erred by failing to give his proposed instructions 2, 3, and 8 instructing the jury on the presumption of leniency.

The trial court gave the following instruction:

During this special sentencing proceeding, the State has the burden of proving to you beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency and that the death penalty should therefore be imposed.

A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a

doubt as would exist in the mind of a reasonable person after fully, fairly and carefully considering all of the evidence or lack of evidence. If, after such consideration, you have an abiding belief that there are not sufficient mitigating circumstances to merit leniency, you are satisfied beyond a reasonable doubt.

On the other hand, if, after such consideration, you do not have an abiding belief that the State has proved beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency, you are not satisfied beyond a reasonable doubt.

Instruction 3; Clerk's Papers, at 546.

■ There is no constitutional right to a presumption of sufficient mitigating circumstances to merit leniency. *State v. Benn*, 120 Wn.2d 631, 668, 845 P.2d 289, *cert. denied*, 114 S. Ct. 382 (1993); *Mak*, 105 Wn.2d at 756. This right is created by statute in Washington. RCW 10.95.060(4). Accordingly, the giving of leniency instructions is consistent with our statutory scheme. *See State v. Jeffries*, 105 Wn.2d 398, 422, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986); *Benn*, 120 Wn.2d at 668; *Campbell v. Kincheloe*, 829 F.2d 1453, 1465-66 (9th Cir. 1987), *cert. denied*, 488 U.S. 948 (1988). We do not believe the lack of such an instruction, however, confuses or misleads the jury or alters the State's burden. Although such instructions may provide additional clarification, the State's burden of proof "necessarily carries with it a presumption in favor of the defendant." *Campbell*, 829 F.2d at 1466. *See* WPIC 31.05 cmt., 11 Wash. Prac. WPIC 353-54 (2d ed. 1994).

19. No Sympathy Instruction.

Brett contends the "no sympathy" instruction violates Const. art. 1, § 3 (due process) and Const. art. 1, § 14 (cruel punishment) and is inconsistent with the "mercy" instruction.

The court gave the following instruction:

You are officers of the court and must act impartially and with an earnest desire to determine and declare the proper verdict. Throughout your deliberations you will permit neither sympathy nor prejudice to influence you.

Instruction 1; Clerk's Papers, at 543-44. The Defendant's proposed instruction deleted the "no sympathy" language.

 We upheld an identical instruction under the Eighth and Fourteenth Amendments. *In re Rupe*, 115 Wn.2d 379, 390, 798 P.2d 780 (1990) (*Rupe* III).

> Allowing a jury to decide whether to impose the death sentence based upon the emotional reaction of sympathy is irreconcilable with the federal constitutional requirement that a sentencing decision be reliable and nonarbitrary — the constitutionally required exercise of channeled discretion by the sentencing jury. . . .

*Rupe* III, at 396. In so holding, the majority stated in dicta that "the state constitution could not permit what is forbidden under the United States Constitution." *Rupe* III, at 396. In addition, Brett's conclusion that the *Gunwall* factors justify broader protections under the state constitution are based on arguments rejected by this court in *Rupe* III. Lastly, this court has held that mercy, as opposed to sympathy, is a proper mitigating circumstance. *See Mak*, at 754; *Rupe* III, at 407-08 (Utter, J., dissenting). *See also* WPIC 31.03 cmt. (passion, prejudice, and sympathy are emotional considerations, while mercy is based on reason).

20. Duty To Consult Instruction.

Brett argues the penalty phase instructions on jury unanimity are conflicting and could reasonably be interpreted to require unanimity to return a verdict for life in violation of the state death penalty statute, state and federal due process, and cruel punishment clauses. This argument is without merit. The instructions cited by Brett neither conflict nor create the possibility the jury would be misled to believe it must reach a unanimous decision to return a verdict for life without possibility of parole.

 The duty to consult instruction provides:

> Jurors have a duty to consult with one another and to deliberate with a view to reaching a unanimous verdict, if it can be done without violence to individual judgment. Each of you must decide the case for yourself but only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, you should not hesitate to re-

examine your own views and change your opinion if you are convinced it is erroneous. *However, you should not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinions of your fellow jurors, or for the mere purpose of returning a verdict.*

(Italics ours.) Instruction 2; Clerk's Papers, at 545. When read in its entirety, this instruction does not imply the jury has a "duty" to reach a unanimous verdict for life. The verdict form and instruction 4 clearly inform the jury that if it is unable to unanimously agree, the sentence will be life without parole. The verdict form provides:

> [ ] "Unable to Unanimously Agree"
> (In which case the defendant shall be sentenced to life imprisonment without possibility of parole)

Clerk's Papers, at 554. Instruction 4 stated:

> If you unanimously answer "no," or if you are unable to agree on a unanimous answer, the sentence will be life imprisonment without the possibility of parole.

Clerk's Papers, at 547. Instruction 10 also expressly allows for a nonunanimous verdict.

> If all twelve of you are unable to unanimously agree, fill in the answer to the question in the appropriate place on the verdict form. . . .

Clerk's Papers, at 553.

These jury instructions are not misleading and each informs the jury that it may return a verdict if the jurors are unable to agree.

21. Mitigating Factors Not Relied on by Defense.

Brett contends the trial court erred in giving an instruction in the language of RCW 10.95.070, listing the statutory mitigating factors with the instruction that it could consider "any relevant factors, including but not limited to" those listed. Instruction 4; Clerk's Papers, at 547. The defense objected to this instruction and took exception to the court's failure to give its proposed instruction limiting the list of mitigators to those relied on by the defense.

■ Brett argues these instructions allowed the jury to consider the absence of some mitigators as aggravating circumstances and to place less weight on nonstatutory mitigating factors. These arguments have been consistently rejected by this court. It is "well settled" the jury may be instructed in the language of RCW 10.95.070. *See State v. Rupe*, 108 Wn.2d 734, 764, 743 P.2d 210 (1987), *cert. denied*, 486 U.S. 1061 (1988); *Mak*, at 754; *Jeffries*, 105 Wn.2d at 422; *State v. Campbell*, 103 Wn.2d 1, 28, 691 P.2d 929 (1984), *cert. denied*, 471 U.S. 1094 (1985); *Bartholomew II*, 101 Wn.2d at 647; *State v. Rupe*, 101 Wn.2d 664, 709-10, 683 P.2d 571 (1984). *But see* WPIC 31.07 cmt. There was no error.

22. Constitutionality of RCW 10.95.070.

Brett asserts RCW 10.95.070 and instruction 4, which incorporates the statutory language, are unconstitutional because the jury is only told that it "may consider any relevant [mitigating] factors", rather than it *shall* consider such factors. Brett argues the jury may determine what weight to give to such evidence, but should not have the discretion regarding whether to consider the evidence. Otherwise, he contends, the death penalty statute does not "tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428, 64 L. Ed. 2d 398, 100 S. Ct. 1759 (1980). In support, Brett relies on *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982). We disagree.

■ In *Eddings*, the trial court refused, *as a matter of law*, to consider the capital defendant's harsh upbringing and emotional disturbance as mitigating factors. The Court reversed the death sentence based on *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978), which held:

[T]he Eighth and Fourteenth Amendments require that the sentencer . . . *not be precluded from considering, as a mitigating factor,* any aspect of a defendant's character or record

and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

(Some italics ours.) *Eddings*, 455 U.S. at 110 (quoting *Lockett*, 438 U.S. at 604). The *Eddings* Court stated:

Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf. . . .

*Eddings*, 455 U.S. at 113-14.

RCW 10.95.070 and instruction 4 did not preclude the jury from considering any of the mitigating evidence presented by Brett. On the contrary, both the statute and the instruction allow consideration of all such evidence. The jury is allowed to give the evidence little, if any, weight, but this does not run afoul of *Eddings* and *Lockett*. The jury was not told to disregard evidence of Brett's upbringing. There was no error.

Brett also asserts RCW 10.95.070(1), (2), and (6) are unconstitutional because the terms "significant", "extreme", and "substantially" are vague and do not sufficiently channel the jury's discretion. *See Godfrey v. Georgia, supra.* RCW 10.95.070 provides:

[T]he jury . . . may consider any relevant factors, including but not limited to the following:

(1) Whether the defendant has or does not have a *significant* history, either as a juvenile or an adult, of prior criminal activity;

(2) Whether the murder was committed while the defendant was under the influence of *extreme* mental disturbance;

. . . .

(6) Whether, at the time of the murder, the capacity of the defendant to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of law was *substantially* impaired as a result of mental disease or defect[.]

(Italics ours.) See instruction 4; Clerk's Papers, at 547.

▮ "Significant" is defined as "having meaning; *esp* : full of import". *Webster's Third New International Dictionary*

2116 (15th rev. ed. 1971). "Substantial" means "considerable in amount, value, or worth". *Webster's*, at 2280. "Extreme" means "existing in the highest or the greatest possible degree : very great : very intense". *Webster's*, at 807. Defendant contends the jury will apply the terms in an ad hoc manner, essentially, because each term is defined with the use of more than one word. These terms, however, must be read in context. They are commonly understood terms and provide the jury with an adequate measure when considering the mitigating circumstances. The terms "significant", "extreme", and "substantially" are not inflammatory nor will jury discretion be set rampant by their use. *See State v. Benn*, 120 Wn.2d 631, 674-75, 845 P.2d 289, *cert. denied*, 114 S. Ct. 382 (1993).

23. Prosecutor's Argument on Brett's Background.

██ ██ Brett argues the prosecutor unconstitutionally argued to the jury that the evidence of his upbringing "did not extenuate or reduce Brett's moral culpability." Br. of Appellant, at 219. The court reviews allegations of improper argument under an abuse of discretion standard. *State v. Hughes*, 106 Wn.2d 176, 195, 721 P.2d 902 (1986). The defendant bears the burden of "establishing both the impropriety of the prosecutor's conduct and its prejudicial effect." (Footnote omitted.) *State v. Furman*, 122 Wn.2d 440, 455, 858 P.2d 1092 (1993). Prosecutorial conduct does not constitute prejudicial error unless the appellate court determines there is a substantial likelihood the instances of misconduct affected the jury's verdict. *State v. Evans*, 96 Wn.2d 1, 5, 633 P.2d 83 (1981).

Brett challenges the following statements by the prosecutor:

This background information . . . doesn't reduce the moral culpability that Mr. Brett must accept for his crime.

Report of Proceedings vol. 18, at 96.

Defense has through numerous witnesses put forward to you the fact that this defendant, Mr. Brett, is institutionalized. And the State will agree he is institutionalized. What does it

have to do with the issue before you? How does that reduce his degree of moral culpability? It doesn't. Being institutionalized is interesting. It's nice to know that. But it has nothing to do with the question before you. Absolutely nothing to do with it.

Report of Proceedings vol. 18, at 97.

The prosecutor's arguments were based on instruction 7, which provided:

> A mitigating circumstance is any fact, event, information, or condition about either the offense or about the defendant which in fairness or in mercy may be considered as *extenuating or reducing the degree of moral culpability* or which justifies a sentence of less than death, although it does not justify or excuse the offense.

(Italics ours.) Clerk's Papers, at 550. Brett does not challenge instruction 7. The defense could have argued under the instruction that reduction of moral culpability is only one method in assessing mitigating evidence. The instruction contains a disjunctive which allows a mitigating factor to be any fact, event, or condition "which justifies a sentence of less than death". The defense's failure to make this argument does not render the prosecutor's argument improper or prejudicial.

Brett also argues the prosecutor improperly argued the defendant was not "substantially impaired as a result of mental disease or defect" because he knew right from wrong. He asserts this argument erroneously applied the insanity standard to this mitigating factor. RCW 10.95.070(6). Brett cites to the prosecutor's statement that "[t]here is absolutely no evidence in this case that Mr. Brett on December 3rd, 1991, was suffering from any type of mental disease or defect." Report of Proceedings vol. 18, at 89. The prosecutor argued further that, even if the jury inferred Brett had fetal alcohol syndrome or fetal alcohol effect,

> it doesn't mean anything because Dr. Ryan said people can still make choices. They still make choices, know right from wrong, and they know when they do commit a crime that they shouldn't be doing it.

Report of Proceedings vol. 18, at 91. The prosecutor never

expressly mentioned insanity or RCW 9A.12.010(1)(b), which provides that "as a result of mental disease or defect, the mind of the actor was affected to such an extent that . . . [h]e was unable to tell right from wrong . . .". In context, the prosecutor's statements were consistent with his argument that the mitigation evidence did not reduce the moral culpability of the defendant. The defense was free to argue that, although not reducing his moral culpability, evidence of FAS/FAE would nonetheless "justif[y] a sentence of less than death . . .". Clerk's Papers, at 550. The prosecutor's argument was proper and the instruction to the jury was proper. There was no error.

24. Ineffective Assistance of Counsel.

Brett contends he received ineffective assistance of counsel because trial counsel failed to request an instruction on the elements of the aggravating factors and failed to request an instruction on the effect of voluntary intoxication. During oral argument, defense counsel withdrew their allegation of ineffective assistance based on counsel's failure to obtain an expert to diagnose fetal alcohol syndrome or fetal alcohol effect.

 Washington has adopted the 2-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984) for determining whether counsel was ineffective. *State v. Leavitt*, 111 Wn.2d 66, 758 P.2d 982 (1988); *Mak*. Under that test, the defendant must show counsel's performance was deficient and such deficient performance prejudiced the defendant.

The first prong requires a showing that "counsel's representation fell below an objective standard of reasonableness based on consideration of all of the circumstances." *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). "[S]crutiny of counsel's performance is highly deferential and courts will indulge in a strong presumption of reasonableness." *Thomas*, 109 Wn.2d at 226. The court must distinguish between tactical decisions and ineffectiveness. *In re*

*Jeffries*, 110 Wn.2d 326, 752 P.2d 1338, *cert. denied*, 488 U.S. 948 (1988).

Under the second prong, prejudice is shown when the defendant establishes, with reasonable probability, that but for counsel's errors the outcome of the proceedings would have been different. *Leavitt*, 111 Wn.2d at 72. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Brett contends trial counsel's failure to request instructions on the elements of the robbery, kidnapping, and concealment aggravators constituted ineffective assistance of counsel. He argues aggravators were found to exist when there was no evidence as to particular elements of those crimes. This argument is based on the defense view that only completed crimes may be used as aggravators. Given our contrary holding in this case, there was no error.

Brett also asserts trial counsel's failure to request a voluntary intoxication instruction constitutes ineffective assistance of counsel. The State counters there was not substantial evidence to support the instruction. Brett disagrees citing to Shirley Martin's testimony that she and Brett were high during the planning stages and on the day of the crime. There was also conflicting testimony presented by Kathleen Quinn that Brett did not appear to be under the influence of drugs or alcohol on the day of the crime.

Brett cites to *State v. Thomas, supra*, to support his position. In *Thomas*, the defendant alleged ineffective assistance because her counsel failed to present a diminished capacity defense based on voluntary intoxication to a charge of attempting to elude a police vehicle. There was substantial evidence that Thomas had been drinking heavily prior to the incident and that she had "blacked out" the event. Under this court's construal of the felony flight statute, a defendant's subjective state of mind can be used to rebut an inference created by objective conduct of " ' "wanton and wilful disregard for the lives or property of others . . ." ' ".

*Thomas*, 109 Wn.2d at 227 (quoting *State v. Sherman*, 98 Wn.2d 53, 59, 653 P.2d 612 (1982)). Trial counsel, however, failed to request a *Sherman* instruction so that she could use evidence of her intoxication to rebut the inference created by her driving. The court held counsel's performance was deficient and prejudiced the defendant. The court also characterized the issue as a "close" one. *Thomas*, 109 Wn.2d at 229.

> In the present case, whether trial counsel's deficient performance prejudiced Thomas is a close issue. On the one hand, her driving objectively indicated the required wanton or willful disregard. On the other hand, the record indicates that Thomas was extremely intoxicated. Given a *Sherman* instruction, the jury may have determined that her extreme intoxication negated the required wantonness or willfulness. Without the *Sherman* instruction the jury may well have thought that the objective indication of wanton or willful disregard created by her driving established Thomas' guilt and, therefore, the jury may never have considered the subjective component of RCW 46.61.024 [the felony flight statute]. Thus, we believe a proper instruction on the subjective component of RCW 46.61.024 was crucial. Accordingly, our confidence in the outcome is undermined such that we cannot say Thomas received effective assistance of counsel. . . .

*Thomas*, 109 Wn.2d at 229.

The facts regarding Brett's intoxication are not as substantial as those in *Thomas*; they are conflicting. Shirley Martin's testimony, however, was probably sufficient to request a voluntary intoxication instruction. The failure to request such an instruction does not appear to have been a tactical decision given the defense strategy to show Brett's lack of premeditation. The record, however, does not support Brett's contention of prejudice because there was overwhelming evidence of premeditation. The jury would have had to find that during all of the planning and implementation of this crime Brett was so intoxicated that it negated the element of intent required for premeditation. Given the weight of the evidence supporting premeditation, Brett fails to show there is a reasonable probability the inclusion of such an instruction would have changed the outcome of the proceedings.

25. Jurisdiction To Impose a Death Sentence.

RCW 10.95.040(2) provides:

> The notice of special sentencing proceeding shall be filed and served on the defendant or the defendant's attorney within thirty days after the defendant's arraignment upon the charge of aggravated first degree murder . . ..

The defense concedes the State filed a timely notice of intent to seek the death penalty following the filing of the original information. Brett asserts, however, that when the second amended information was filed, the body of the notice only referred to the first amended information. The notice stated:

> [The prosecuting attorney] does by this give notice that demand is made for a special sentencing proceeding to determine whether or not the defendant, James Leroy Brett, should have imposed upon him a sentence of death as to Count 1 of the Amended Information filed herein . . ..

Clerk's Papers, at 206. Brett argues that because the notice refers to the amended information and he was never arraigned on the first amended information, the notice is invalid and the trial court lacked jurisdiction to impose a death sentence. The notice, however, refers to the "Amended Information *filed herein*". The second amended information was the only amended information filed with the notice. In addition, the prosecuting attorney referred to the second amended information in his accompanying affidavit.

> An Amended Information was filed with this court on March 27, 1992, and a *"Second Amended" Information was filed on April 26, 1992, Count I of which continues to charge the defendant with the crime of Aggravated Murder in the First Degree* . . .
>
> I continue to have reason to believe . . . that there are not sufficient mitigating circumstances in this case to merit leniency.

(Italics ours.) Clerk's Papers, at 207-08.

The notice of intent to seek the death penalty can only be referring to the second amended information. On April 16, 1992, the day Brett was to be arraigned on the first amended information, the court granted the State's motion to file the second amended information. Brett was arraigned on that

information, and the notice to seek the death penalty was filed on that day. The State complied with the requirements of RCW 10.95.040(2).

26. Motion for Continuance.

On June 17, 1992, the defense moved for a continuance of the penalty phase proceedings for 1 month to secure an expert to evaluate whether Brett suffered from fetal alcohol syndrome or fetal alcohol effect. Defense counsel asserted they learned of this potential issue after Brett's mother testified during the penalty phase that she drank heavily during her pregnancy. Thereafter, defense counsel consulted with medical staff at the Oregon Health Sciences University and after initial indications they would be available, counsel was advised on June 12, 1992, that the staff would not assist due to potential liability concerns. Defense counsel contacted the offices of Dr. Sterling Clarren in Seattle, but was advised the doctor was on vacation until June 26, 1992. Dr. Sabin, a pediatrician in Portland able to diagnose FAS/FAE, was then contacted but was unable to assist on such short notice and would need 2 to 4 weeks to schedule an evaluation.

The State objected to the continuance arguing the defense had over 6 months to prepare the case, had experts appointed on an ex parte basis from an independent judge to allow for confidentiality in its investigation, and had not notified the State that any expert was to be called. The State also asserts the defense was not surprised by Mrs. Brett's testimony regarding her alcoholism. Mrs. Brett was available to the defense since the inception of the case and the defense conducted voir dire with the jury about the issue of fetal alcohol syndrome. In addition, in its motion for a hearing to take additional evidence, the defense submitted an affidavit from defense counsel indicating knowledge of this issue since the middle of April 1992.

The State also asserts that after the ex parte file was opened, the prosecutor consulted with Robert Stanulis, a neuropsychologist retained by the defense. Dr. Stanulis in-

formed the prosecutor that the effect on a person suffering from fetal alcohol syndrome is subnormal intelligence, and the cause of that deficiency is irrelevant in determining whether the deficiency would be considered a mitigating circumstance. The State added that evidence of Brett's lower intelligence was already before the jury, and the cause of his mental deficiency was irrelevant. Dr. Stanulis was subsequently not called as a witness by the defense.

The trial court denied the motion stating:

> As far as the fetal alcohol syndrome being a proximate cause, if you will, of what took place, I don't know — that's what Mr. Curtis [prosecutor] was talking about, was basically its relevance in that regard. The issue of course is mitigation . . .. So the concern is whether or not the jury will crank this into their thought processes and determine whether or not it should be life without parole or the death penalty.
>
> But that gets me back to the issue of even if an expert says, yes, James does have fetal alcohol syndrome or fetal alcohol effect, the issue is whether or not that would excuse the act or as to whether or not it would explain as Mr. Dane [defense counsel] so aptly put it in opening statement. The jury has heard about Sherry Brett's drinking. That's a credibility issue. . . . We know that James' behavior according to the memo that Mr. Foister [defense counsel] has given may exhibit certain characteristics that are consistent with fetal alcohol effect. The expert that you call can testify that these are the symptoms. I presume you got this data in the memo that these are the symptoms of fetal alcohol syndrome or fetal alcohol effect, and you can argue to the jury that these are the symptoms of fetal alcohol effect. Sherry Brett says she was drinking. These are the symptoms that James has portrayed. And, therefore, ladies and gentlemen, it's a logical conclusion or inference that James was suffering from fetal alcohol syndrome or fetal alcohol effect and ask for mercy on that basis.
>
> I don't think the fact that we're not bringing the experts in to testify that James, in fact, has fetal alcohol syndrome or fetal alcohol effect is going to be that crucial to the argument that you're going to put before the jury. And I think when I weigh that versus the abatement of the case for up to 30 days — and when we say 30, we're probably talking longer — I think it would be an injustice to the State and to the victim. So I will deny the motion.

Report of Proceedings vol. 17, at 149-50.

Following denial of the motion, the parties agreed the defense could argue the inference to the jury, the State could inform the jury there was no diagnosis, but it could not comment as to why there was no diagnosis.

The court reviews the denial of a continuance under an abuse of discretion standard. *State v. Campbell*, 103 Wn.2d 1, 14, 691 P.2d 929 (1984), *cert. denied*, 471 U.S. 1094 (1985).

Under the circumstances in this case, the trial court did not abuse its discretion in denying the continuance. The defense presented testimony from Dr. Ryan, a chemical dependency and mental health counselor, regarding the symptoms exhibited by persons suffering from FAS and FAE and the causative factors leading to those conditions. Testimony was presented regarding Brett's upbringing and behavior which allowed the defense to argue and the jury to infer that Brett suffered from FAS or FAE.

In addition, a diagnosis of FAS/FAE, according to defense retained expert Dr. Stanulis, would place nothing more than a label on Brett's lower intelligence and behavioral problems, evidence which was already before the jury. With or without the diagnosis or label, the defense could argue that such evidence mitigated in favor of the lesser sentence.

Although this is a capital case and we review alleged errors in the penalty phase with heightened scrutiny, the standard of review is not raised. *State v. Benn*, 120 Wn.2d 631, 648, 845 P.2d 289, *cert. denied*, 114 S. Ct. 382 (1993). After carefully reviewing the record, we are not persuaded the trial court abused its discretion in denying the motion for the continuance. An affirmative diagnosis was not certain, the defense was free to argue Brett suffered from FAS/FAE, and Dr. Stanulis indicated a diagnosis would add nothing further to the evidence of Brett's lower intelligence and behavioral problems, evidence which was already before the jury.

27. Constitutionality of RCW 10.95.

▓▓ Brett asserts RCW 10.95 is unconstitutional because it provides inadequate standards to guide the prosecutor's discretion to seek the death penalty. This argument has been "repeatedly rejected" by this court. *Benn*, 120 Wn.2d at 667. Next, Brett "adopts and incorporates by reference" 13 arguments advanced by the appellants in previous capital cases: (1) RCW 10.95 violates the separation of powers doctrine; (2) RCW 10.95 violates the state and federal equal protection clauses; (3) RCW 10.95 is void for vagueness; (4) RCW 10.95 constitutes cruel and unusual punishment; (5) RCW 10.95 promotes unequal administration of the law in violation of the Fourteenth Amendment; (6) the Defendant should have been charged by indictment rather than information; (7) the combined effect of RCW 10.95.040 and not obtaining an indictment exacerbates the separation of powers problem; (8) RCW 10.95 amounts to a mandatory death penalty statute; (9) RCW 10.95.060 unconstitutionally shifts the burden to the defendants; (10) RCW 10.95 denies a defendant the right to effective appellate review because it does not require the jury to articulate which mitigating circumstances were found and how they were weighed; (11) RCW 10.95.020 violates due process, rights to a fair trial, effective assistance of counsel, and confrontation by failing to provide a defendant with the right to rebut information given to the trial judge; (12) RCW 10.95.020 is unconstitutional because it fails to narrow the class of persons eligible for the death penalty; and (13) the process of death qualifying the jury violates the guaranties to a fair and impartial jury under the state and federal constitutions.

▓▓ We decline to address these issues based solely upon incorporated arguments. *See* RAP 10.3(a)(5) (brief must include argument as well as citation to legal authority); *State v. Lord*, 117 Wn.2d 829, 916, 822 P.2d 177 (1991), *cert. denied*, 506 U.S. 856 (1992). We note, however, these argu-

ments have been previously rejected. *See State v. Campbell, supra* (issues 1 through 4); *State v. Rupe, supra; State v. Dictado*, 102 Wn.2d 277, 687 P.2d 172 (1984) (issue 5); *State v. Ng*, 104 Wn.2d 763, 713 P.2d 63 (1985) (issue 6); *State v. Jeffries, supra* (issues 7 through 11); *Bartholomew* I; *Bartholomew* II; *State v. Kincaid*, 103 Wn.2d 304, 692 P.2d 823 (1985) (issue 12); *State v. Irizarry*, 111 Wn.2d 591, 763 P.2d 432 (1988); *State v. Hughes*, 106 Wn.2d 176, 721 P.2d 902 (1986); *State v. Kron*, 63 Wn. App. 688, 821 P.2d 1248 (issue 13), *review denied*, 119 Wn.2d 1004 (1992).

## 28. Sufficiency of the Evidence.

▉▉ Brett argues there was insufficient evidence to support the jury's verdict of death. The court reviews the evidence in the light most favorable to the prosecution to determine if any rational trier of fact could have found sufficient evidence to justify the verdict beyond a reasonable doubt. *State v. Rupe*, 108 Wn.2d 734, 765, 743 P.2d 210 (1987), *cert. denied*, 486 U.S. 1061 (1988); *Benn*, 120 Wn.2d at 677.

Brett argues the jury's verdict was not justified because the killing did not involve prolonged torture or viciousness; Brett was raised by a neglectful, alcoholic mother and several alcoholic stepfathers; he was institutionalized and would sabotage his gains to return to a more structured environment; he had a low intelligence and might suffer from FAS or FAE; he helped a Maple Lane counselor in a potentially dangerous situation involving another juvenile inmate; and he was capable of being a gentle caring person to his nephews and Martin's son.

Weighing against these mitigating circumstances is the crime of which Brett was found guilty. *See* RCW 10.95-.060(4). The crime that was planned was horrendous, including injecting a toxic substance into the victims' heads to kill them. The actual killing involved picking a house at random, shooting the occupant, Mr. Milosevich, in the chest in front of his wife, and reloading the weapon and shooting him again in the back of the head while Mr. Milosevich

pleaded for his life. Although the plan went awry, the murder was planned, items were obtained to facilitate the crime, and steps were taken to cover up the crime. The crime was committed in the course of a burglary, robbery, and kidnapping, and to conceal the identity of the perpetrators.

Given the nature of the crime, its planning, and the number of aggravating factors, a rational trier of fact could find insufficient evidence to merit leniency beyond a reasonable doubt. We hold there was sufficient evidence to justify the jury's verdict.

29. Proportionality Review.

RCW 10.95.130(2)(b) provides this court must determine:

> Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. For the purposes of this subsection, "similar cases" means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120[.]

Brett contends proportionality review cannot be conducted on a principled basis because the "universe" of cases from which "similar" cases are drawn for comparison is not reliable. He asserts the "universe" includes cases from two invalid death penalty statutes, cases where sympathy instructions were allowed, cases where proportionality review was not conducted, and cases where review was conducted when the "universe" was smaller. Brett also asserts the "universe" is incomplete because under the former death penalty statute defendants could avoid the death penalty by pleading guilty. Brett further contends trial court reports do not contain adequate information regarding mitigating circumstances. Lastly, he argues there is no definition for what makes a case "disproportionate".

Recently, a Federal District Court held Washington's proportionality review violates a defendant's procedural due

process rights because RCW 10.95.130 "does not establish adequate standards or guidelines on which the Court or the parties can rely." *Harris v. Blodgett*, 853 F. Supp. 1239, 1288 (W.D. Wash. 1994). The court cited five reasons for its ruling: (1) the death penalty statute does not define what cases are "similar" or what other factors, such as age, race, sex, pregnancy, should be considered; (2) there is no procedure for the parties to be notified as to which cases, or types of cases, the court may consider similar until the decision is published; (3) the statute does not provide an alternate procedure when no similar cases are found; (4) the statute does not give any standard for reviewing the selected cases; and (5) there is no procedure for factfinding as part of the sentence review. *Harris*, at 1288-90.

Without determining the merits of these challenges under this court's current proportionality review, we take this opportunity to revisit the development of such review in Washington and evaluate the continued viability of our present approach. In the past, the court has struggled with conducting proportionality review. *See, e.g., Benn*, 120 Wn.2d at 679. This difficulty stems in part from attempting to define "similar cases" without adopting a standard which requires, in essence, mathematical identity. The court has taken an increasingly broad approach to its definition of similar cases, replacing the comparison of aggravating factors with the search for family resemblances. *See Lord*, 117 Wn.2d at 908-11. We still recognize, however, "the difficulties inherent to the identification of 'similar cases'" while utilizing the family resemblances approach. *Benn*, 120 Wn.2d at 691.

The court has also struggled to define what makes a case proportional. We adopted the current test by reference to Georgia's interpretation of its death penalty statute.

> [T]his court is not required to determine that less than a death sentence was never imposed in a case with some similar characteristics. On the contrary, we view it to be our duty under the similarity standard to assure that no death sentence is affirmed unless in similar cases through-

> out the state the death penalty has been imposed *generally* and not "wantonly and freakishly imposed," . . .[.]

*Lord*, 117 Wn.2d at 909 (quoting *State v. Harris*, 106 Wn.2d 784, 798, 725 P.2d 975 (1986), *cert. denied*, 480 U.S. 940 (1987), *writ of habeas corpus granted sub nom. Harris v. Blodgett*, 853 F. Supp. 1239 (W.D. Wash. 1994). *See Moore v. State*, 233 Ga. 861, 864, 213 S.E.2d 829 (1975), *cert. denied*, 428 U.S. 910 (1976), *habeas corpus granted in part sub nom. Blake v. Zant*, 513 F. Supp. 772 (S.D. Ga. 1981), *aff'd in part, rev'd in part sub nom. Moore v. Balkcom*, 716 F.2d 1511 (11th Cir. 1983). The court has continued to broaden its approach to proportionality review by focusing on two systemic problems in death sentencing that such review was meant to avoid: random arbitrariness and death sentences based on the defendant's race. *Benn*, 120 Wn.2d at 680 (citing *Lord*, 117 Wn.2d at 909).

The origins and purpose of proportionality review support the broad approach taken by this court and suggest an even broader review is constitutionally permissible, more faithful to the literal language of RCW 10.95.130, and not subject to the types of challenges posed by Brett and those upheld in *Harris v. Blodgett, supra.*

Prior to the Supreme Court's opinion in *Furman v. Georgia*, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972) (per curiam), jurors had "untrammeled discretion" to impose the death penalty. *Furman*, 408 U.S. at 248 (citing *McGautha v. California*, 402 U.S. 183, 28 L. Ed. 2d 711, 91 S. Ct. 1454 (1971)). The *Furman* Court, for the first time, held the jury's unguided discretion to impose the death penalty violated the Eighth and Fourteenth Amendments by allowing the death penalty to be "wantonly and . . . freakishly" imposed. *Furman*, 408 U.S. at 310 (Stewart, J., concurring).

In response to *Furman*, Georgia amended its death penalty statute to provide the standards which would guide the jury's discretion in imposing the death penalty. The statute required appellate review, including a determination "whether the sentence is disproportionate compared to those sentences

imposed in similar cases." *Gregg v. Georgia,* 428 U.S. 153, 198, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976) (joint opinion). These standards were upheld.

The Court was clear, however, that the procedures adopted by Georgia were not the only procedures which would be permissible under *Furman.*

> We do not intend to suggest that only the above-described procedures would be permissible under *Furman* or that any sentencing system constructed along these general lines would inevitably satisfy the concerns of *Furman,* for each distinct system must be examined on an individual basis. Rather, we have embarked upon this general exposition to make clear that it is possible to construct capital-sentencing systems capable of meeting *Furman's* constitutional concerns.

(Footnotes omitted.) *Gregg,* 428 U.S. at 195. In upholding Georgia's statutory scheme, the Court focused on the standards provided to guide the jury's discretion.

> The basic concern of *Furman* centered on those defendants who were being condemned to death capriciously and arbitrarily. Under the procedures before the Court in that case, sentencing authorities were not directed to give attention to the nature or circumstances of the crime committed or to the character or record of the defendant. Left unguided, juries imposed the death sentence in a way that could only be called freakish. The new Georgia sentencing procedures, by contrast, focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant. While the jury is permitted to consider any aggravating or mitigating circumstances, it must find and identify at least one statutory aggravating factor before it may impose a penalty of death. *In this way the jury's discretion is channeled. No longer can a jury wantonly and freakishly impose the death sentence; it is always circumscribed by the legislative guidelines.*

(Italics ours.) *Gregg,* 428 U.S. at 206-07.

Washington's death penalty statute similarly focuses the jury's attention on the nature of the crime and characteristics of the defendant. *See* RCW 10.95.060. As in *Gregg,* the legislative guidelines contained in RCW 10.95 within which the jury must exercise its discretion ensure proportionality and eliminate the ability of the jury, in all

but the most aberrant case, to impose the death sentence in a wanton and freakish manner. Thus, our review, to be constitutionally sufficient, need only find that aberrant or "disproportionate" case. RCW 10.95.130(2)(b).

With this perspective, the range of similar cases need not be narrowly defined based upon the number of aggravators or even family resemblances. Rather, "similar cases" means exactly what the Legislature defined them to mean:

> "[S]imilar cases" means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120[.]

RCW 10.95.130(2)(b). The Legislature has determined these cases are sufficiently similar so that a "disproportionate" case can be recognized therefrom.

In *Gregg*, the Court noted the Supreme Court of Georgia had reduced death sentences to life imprisonment for defendants convicted of the capital crimes of rape and armed robbery because prior cases showed juries would only rarely impose the death sentence for those crimes. *Gregg*, 428 U.S. at 205-06. The Court stated further:

> If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death.

*Gregg*, 428 U.S. at 206. Washington's statute, however, does not contain a myriad of capital crimes. It allows the death penalty only for one "kind" of murder, premeditated first degree murder with aggravating circumstances. There is no constitutional requirement that we define this concept further, that is, categorizing different "kinds" of murder based upon family resemblances. In addition, RCW 10.95.020 does not weight aggravating circumstances, such that one type of aggravator makes the crime a separate "kind" of murder.

The Eighth and Fourteenth Amendments mandate that capital sentencing procedures channel the jury's discretion

by focusing the jury's attention on the particular nature of the crime and characteristics of the defendant. *See Gregg*, 428 U.S. at 206-07. Appellate proportionality review provides a "check" or "additional assurance" against arbitrary imposition of the death penalty. *Gregg*, 428 U.S. at 206-07. These requirements are met in Washington.

The legislative guidelines contained in RCW 10.95 ensure proportionality in the first instance by focusing the jury on the crime and the defendant. On review, RCW 10.95.130 requires this court to determine whether the death sentence is "disproportionate" based on the broad range of "similar cases", as defined by the Legislature. RCW 10.95.130(2)(b). The lack of a detailed comparison of cases which we have conducted in the past will not render this review an "empty ritual" because we recognize its purpose is not meant to ensure proportionality in the first instance. *Benn*, 120 Wn.2d at 709 (Utter, J., dissenting). *Gregg* teaches the legislative guidelines in RCW 10.95 serve that function. Rather, our review must determine whether a death sentence is disproportionate.

The circumstances under which a death sentence might be disproportionate or wanton and freakish, given the guidelines contained in RCW 10.95, are limited. We can, however, conceive of circumstances under which a death sentence could be challenged as disproportionate. Comment on such circumstances must await the cases and controversies which squarely present those issues.

This "disproportionality" review is not subject to the challenges raised by Brett and those upheld in *Harris v. Blodgett, supra*. Using the legislative definition of "similar cases" alleviates the due process concerns expressed in *Harris v. Blodgett, supra*. Refocusing the review to ascertain only whether a death sentence is wanton and freakish based upon the broad range of aggravated murder cases provides a more reliable and justifiable standard of "disproportionality" and renders negligible the effect of slight deviations in the universe of "similar cases". The function of the review is

limited to providing "additional assurance" that a sentence is not disproportionate, rather than ensuring proportionality in the first instance. *See Gregg*, 428 U.S. at 206-07. That function is inherent in the guidelines contained in RCW 10.95. In addition, this method of review does not require the parties or the court to ascertain, in essence, mathematical proportionality. There is no constitutional or statutory requirement to ensure an unattainable degree of identity among particular cases which are invariably unique.

We review whether Brett's sentence is disproportionate under this standard. Consequently, we need not limit our review to subcategories of aggravated murders to determine whether Brett's sentence was excessive or disproportionate. Rather, the court looks to all "similar cases", as legislatively defined, to ascertain whether the imposition of death in this case is disproportionate.

Initially, we point out the guidelines contained in RCW 10.95 channeled the jury's discretion. The jury was properly instructed regarding the aggravating and mitigating factors it could consider in exercising its discretion to impose the death penalty.

After carefully reviewing the totality of similar cases, we hold Brett's death sentence is not disproportionate. There is no unique or distinguishing characteristic of the Defendant or of this crime which makes imposition of the death penalty wanton and freakish. Our decision is not altered by cases in which the jury exercised its power and declined to impose the death penalty.

> Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice.

*Gregg*, 428 U.S. at 203. Unless and until juries consistently decline to impose the death sentence, specific instances of mercy cannot be used to establish disproportionality. *See Gregg*, 428 U.S. at 205-06.

We hold the imposition of the death penalty in this case is not excessive or disproportionate considering the crime and the Defendant.

30. Passion or Prejudice.

■ The majority of Brett's argument supporting his allegation of passion and prejudice involves errors addressed in other parts of his appeal. These errors cannot be reiterated as support for a passion and prejudice argument. *Benn*, 120 Wn.2d at 693; *Lord*, 117 Wn.2d at 915. Brett asserts one independent ground supporting this issue. He contends the prosecutor inflamed the jury by invoking the jurors' fears of random violence by the following argument:

> Another thing that I would ask you to consider, ladies and gentlemen, about this crime and why this crime is so aggravated is the randomness and the total innocence of the victims in this case, Ken and Pat Milosevich. You've heard from witnesses in this case, Mrs. Stahl, the neighbor down the street, Mr. Coleman, the neighbor to the north where Pat Milosevich went to call 9-1-1, Mrs. Wasser, the neighbor to the south, who didn't hear anything that night, that any one of them could have been Ken Milosevich. It was pure luck of the draw on December 3rd. And it could have been Ken Milosevich on this witness stand testifying about any one of those people that night. And that's something that I think bothers all of us, that unknowing, the fact that it could happen to anybody.

Report of Proceedings vol. 18, at 99.

■ Arguments which may evoke an emotional response are appropriate if the prosecutor restricts his argument to the circumstances of the crime. *See State v. Rice*, 110 Wn.2d 577, 608-09, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989). Here, the evidence established the random nature of the act. The argument was based on this evidence and was not overemphasized. Although the prosecutor's argument steps close to the line of impropriety, it does not cross the line into passion and prejudice.

We affirm the conviction and the imposition of the death sentence.

Durham, C.J. (concurring) — In virtually every recent death penalty case decided by this court, a different defini-

tion of proportionality has been promulgated. The resulting confusion is unacceptable.

Prior to 1987, proportionality was defined in very general terms. *See State v. Mak*, 105 Wn.2d 692, 724, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986). Reversal of a death sentence was required only if the sentence had been " 'wantonly and freakishly imposed'', or if taken together similar cases did not result in a death penalty verdict. *State v. Rupe*, 108 Wn.2d 734, 767, 743 P.2d 210 (1987) (quoting *State v. Harris*, 106 Wn.2d 784, 798, 725 P.2d 975 (1986), *cert. denied*, 480 U.S. 940 (1987)), *cert. denied*, 486 U.S. 1061 (1988).

However, in *In re Jeffries*, 114 Wn.2d 485, 489-91, 798 P.2d 731 (1990), we began to engage in a more detailed examination of the proportionality principle. We cautioned against second-guessing prosecutors' charging decisions and juries' verdicts recognizing that, while two cases may appear similar at first glance, different outcomes may result from persuasive mitigating circumstances. *Jeffries*, at 490.

Shortly thereafter, seven members of this court (Dore, C.J., dissented on other grounds) adopted an analytical framework for proportionality in *State v. Lord*, 117 Wn.2d 829, 822 P.2d 177 (1991), *cert. denied*, 506 U.S. 856, 121 L. Ed. 2d 112, 113 S. Ct. 164 (1992). In *Lord* we recognized that the primary purpose behind a proportionality analysis was to eradicate a historical and systemic problem in the application of the death penalty throughout the country; namely, that the death penalty often was imposed with regards to the race of perpetrators and victims, rather than the facts of the crime. *Lord*, at 910. Further, we acknowledged that it was impossible to expect the facts of every case resulting in a death penalty sentence to somehow match up. Instead, we determined that it was necessary to search for a family of resemblances. In other words, rather than requiring a death penalty case to have "one characteristic or set of attributes in common" with other cases, we insisted on a "network of overlapping similarities". *Lord*, at 911.

This was followed by *State v. Dodd*, 120 Wn.2d 1, 838 P.2d 86 (1992), which agreed generally with the *Lord* approach.

However, less than 2 years later, *State v. Benn*, 120 Wn.2d 631, 845 P.2d 289, *cert. denied*, 510 U.S. 944, 126 L. Ed. 2d 331, 114 S. Ct. 382 (1993) suggested a statistically based version of proportionality.

Now, the majority suggests yet another version of proportionality. See majority, at 207-214. It is not so much that I disagree with the majority's analysis as with the revisions in each new case.

It may be that proportionality itself depends on the consistency of a proportionality analysis. If applying a varied proportionality analysis with each case produces varying results, we thwart RCW 10.95.130(2)(b) which requires this court to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases", and ultimately we may commit a tragic disservice to the victims of these crimes. Moreover, the resulting confusion contributes to an already excessive delay in these cases.

I recommend adopting the proportionality test established in *Lord* because it garnered the most support and provides the most reasoned analysis.

GUY, J., and ANDERSEN and BRACHTENBACH, JJ. Pro Tem., concur with DURHAM, C.J.

DOLLIVER, J. (specially concurring) — The people of the state of Washington have expressed their will by enacting the death penalty, and my duty as a justice of this court is to uphold that law. However, I agree with the words quoted by Justice Blackmun in his dissent to *Callins v. Collins*, 510 U.S. 1141, 127 L. Ed. 2d 435, 114 S. Ct. 1127 (1994) that " '. . . the infliction of [death] is so plainly doomed to failure that it — and the death penalty — must be abandoned altogether.' " *Callins*, 114 S. Ct. at 1138 (Blackmun, J., dissenting) (quoting *Godfrey v. Georgia*, 446 U.S. 420, 442, 64 L. Ed. 2d 398, 100 S. Ct. 1759 (1980) (Marshall, J., concurring in the judgment)).

Although I do not question my duty, I write this separate concurrence to state my objection to the death penalty in principle and to express the hope that some day we will eliminate the death penalty and be saved from cries of vengeance, revenge, or "justice" and thus become a more truly civilized community of citizens.

Until that point arrives, if the laws are both constitutional and exactly followed, as was the case here, the ultimate penalty must be enforced. I also do not question that whether one agrees, as I firmly do, with the majority's rule for determining proportionality or one adopts the test in *State v. Lord*, 117 Wn.2d 829, 822 P.2d 177 (1991), *cert. denied*, 506 U.S. 856, 121 L. Ed. 2d 112, 113 S. Ct. 164 (1992), as proposed in Chief Justice Durham's concurrence, the result in this case is the same: the imposition of the death penalty for this brutal crime is not disproportionate under the law.

SMITH, J., concurs with DOLLIVER, J.

MADSEN, J. (concurring in part, dissenting in part) — I concur with the majority on all issues relating to the penalty phase of Mr. Brett's trial. However, the dissent is correct that the brief continuance requested for the purpose of retaining an expert should have been granted. Considering the fact that the appellate process in this case will likely span a decade, 30 days to secure testimony in mitigation was an insignificant delay which should have been permitted. I would remand for a new penalty phase.

UTTER, J. (dissenting) — Contrary to the plurality's conclusion, Brett's sentence of death cannot be sustained on the record before us. The issues which require the reversal of Brett's sentence are: (1) the trial court's failure to grant him a continuance to secure an expert's opinion on whether he suffers from fetal alcohol syndrome; (2) the disproportional-

ity of his sentence; (3) the scope of the evidence admitted to rebut his mitigation witnesses; and (4) the instructional error suggesting unanimity was required before the jury could reach a final verdict.

The trial court's denial of Brett's motion for a continuance to further investigate the possibility he suffers from fetal alcohol syndrome is reversible under an abuse of discretion standard because it was based on invalid grounds. Moreover it frustrated Brett's right under the United States Constitution and under RCW 10.95.070(1), (2), and (6) to meaningfully argue the issue of mitigation. Finally, it prevented the jury from making an informed evaluation of whether the State had shown insufficient mitigating circumstance to warrant leniency — the jury's chief function at the sentencing phase. *See* RCW 10.95.060.

I write also to point out that the treatment of the proportionality issue in Justice Dolliver's opinion is untenable both logically and jurisprudentially. That opinion maintains the fact a crime falls within the purview of the aggravated murder statute "ensures its proportionality", and that our only obligation is to "find that aberrant or 'disproportionate' case". Designated majority, at 211.

This cannot be correct. If the imposition of death in a given case were proportionate simply by virtue of coming within the scope of RCW 10.95, the legislative requirement in RCW 10.95.130(2)(b) that we compare the aggravated murder case at hand to other "similar" aggravated murder cases would be senseless. It is an elementary tenet of statutory construction that we do not construe provisions to be nullities.

Justice Dolliver's opinion replaces the method by which the Legislature has determined we are to decide the issue of proportionality with its own version of what the statute requires, a version which not only is irreconcilable with the statute's terms, but is completely unworkable. If RCW 10.95 "ensures proportionality", can there ever be a "disproportionate" case? If so, by what process, and according to what

standards, are we to identify it? The designated majority offers no guidance.

The result is that an approach purportedly designed to avoid constitutional difficulties increases rather than decreases the likelihood the death penalty will be imposed in an arbitrary and standardless manner, in violation of the equal protection clause of the fourteenth amendment to the United States Constitution. *See Furman v. Georgia*, 408 U.S. 238, 306, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972). This approach is particularly unfortunate because it is not necessary to flout legislative intent to avoid constitutional pitfalls. As my discussion of proportionality will demonstrate, the statute itself establishes a structure which may be accommodated to accomplish its intended function, ensuring the death penalty is not arbitrarily imposed.

I would also reverse Brett's sentence of death because the scope of the evidence introduced to rebut the testimony of a mitigation witness exceeded its permissible scope under *State v. Bartholomew*, 101 Wn.2d 631, 683 P.2d 1079 (1984) (*Bartholomew* II), and introduced highly prejudicial evidence before the jury.

Finally, the jury instructions at the sentencing phase were confusing and created the misimpression unanimity was required before the jury could reach a final verdict.

## I

### FAILURE TO GRANT A CONTINUANCE

Brett requested a continuance or abatement of the penalty phase proceeding until he could secure an expert opinion and evaluation to ascertain the existence of fetal alcohol syndrome or fetal alcohol effect.[1] The motion was denied. Brett maintains the denial constitutes an abuse of the trial court's discretion.

---

[1]To the extent Brett's counsel may be faulted for not contacting experts earlier, their failure to do so should be deemed to constitute ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). *See State v. Thomas*, 109 Wn.2d 222, 743 P.2d 816 (1987).

Brett's motion for a continuance contained a declaration by one of Brett's attorneys indicating that the symptoms of fetal alcohol syndrome or effect include impulsive behavior, inability to fully understand the consequences of one's actions, violent outbursts of anger, and irrational behavior. The motion explained the need for a continuance as follows:

> The evidence in the penalty phase has indicated that the defendant's mother drank heavily during her pregnancy with the defendant and that there is a very high probability that he is the victim of Fetal Alcohol Syndrome or Fetal Alcohol Effect. The defense requests that the sentencing hearing in this matter be continued for 1 month to allow the defendant to be evaluated by a qualified medical doctor to determine if he is in fact the victim [of] damage to his brain during the fetal period.

Justice Dolliver's opinion correctly notes that failure to grant a continuance is reviewed under an abuse of discretion standard. *See, e.g., State v. Williams*, 84 Wn.2d 853, 855, 529 P.2d 1088 (1975), *overruled on other grounds by State v. Gosby*, 85 Wn.2d 758, 539 P.2d 680 (1975). Although the standard of review is deferential, however, the denial of such a motion may, under certain circumstances, operate to deny a defendant a fair trial and due process of law. *State v. Williams*, 84 Wn.2d at 855 (citing *State v. Cadena*, 74 Wn.2d 185, 443 P.2d 826 (1968)). Accordingly, a trial court's denial of a motion for a continuance should be carefully evaluated. As the *Cadena* court explained, "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." *Cadena*, 74 Wn.2d at 189 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589, 11 L. Ed. 2d 921, 84 S. Ct. 841 (1964)).

The trial court's denial of the motion for a continuance was premised on two notions, both of which are untenable even under an abuse of discretion standard. The court reasoned that the evidence would not be useful to the jury, and that the "State and victim" would be unduly burdened by a delay. Report of Proceedings vol. 17, at 149-50. The desig-

nated majority cites these reasons yet fails to appreciate their import, which is to invalidate the trial court's decision.

First, the trial court's opinion that expert evidence would not have been crucial in this proceeding was unwarranted.

If Brett actually does suffer from fetal alcohol syndrome, and the jurors had heard an expert so testify, it is possible that fact alone might have inclined them toward mercy in evaluating the sentence Brett should receive.

Second, an expert's evaluation of whether Brett actually suffered from fetal alcohol syndrome would also have permitted the jury to make an informed — rather than a speculative — evaluation of Brett's mental condition and his capacity to appreciate the wrongfulness of his conduct, both of which are considerations the Legislature has expressly indicated are appropriate inquiries in the penalty phase of a capital case. *See* RCW 10.95.070(1), (2), and (6) respectively. (In determining whether the State has proved insufficient mitigating circumstances to merit leniency, the sentencer may consider any relevant factors, including but not limited to the following: whether the defendant does or does not have a significant criminal history; whether the murder was committed while the defendant was under the influence of extreme mental disturbance (not amounting to insanity or diminished capacity); or whether the defendant's capacity to understand the wrongfulness of his conduct was substantially impaired as a result of mental disease or defect.

Likewise improper was the trial court's assumption the effect on the State of a relatively brief delay should outweigh the Defendant's right to present an informed argument about the presence of factors which would favor leniency in sentencing. This is particularly true in a capital proceeding where the defendant is subject to the most severe sanction available under our sentencing scheme. The focus of the court's concern therefore should have been to assure a proceeding which permitted the most informed consideration by the jury of the question whether the State had

shown an absence of sufficient mitigating circumstances to merit leniency.

The trial court's denial of the motion for a continuance compromised Brett's capacity to fully present mitigating circumstances to the jury. The denial thus derogated from his right under the United States Constitution to have the sentencer consider as a mitigating factor "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" under *Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978). *See also Eddings v. Oklahoma*, 455 U.S. 104, 110, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982).

The court's denial of the motion is particularly significant in the sentencing phase of a capital case because consideration of circumstances which may warrant mercy is not only relevant, it is integral to the task of properly deciding whether the death sentence should be imposed on a particular defendant. *See Harris v. Blodgett*, 853 F. Supp. 1239, 1268 (W.D. Wash. 1994) (citing *Woodson v. North Carolina*, 428 U.S. 280, 304, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976)); *Skipper v. South Carolina*, 476 U.S. 1, 8, 90 L. Ed. 2d 1, 106 S. Ct. 1669 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 110, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982); *see also Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978); *Deutscher v. Whitley*, 884 F.2d 1152, 1161 (9th Cir. 1989).

## II

### PROPORTIONALITY

My objections to proportionality review as conducted by this court are set forth in three parts. The first identifies the principal difficulties inherent in the statutory design; the second explains why the approach to proportionality review in Justice Dolliver's designated majority is infirm; the third applies a proportionality analysis to Brett's sentence of death and concludes the sentence is disproportionate.

## A. Unconstitutionality of the Statutory Scheme as Drafted.

The statutory design under which the proportionality of a defendant's sentence is evaluated is marked by significant flaws which, if not remedied by careful case law elaboration, render it infirm under the federal constitution. These defects have recently been acknowledged by a federal court. *See Harris v. Blodgett, supra* at 1287-91 (overturning a sentence of death in part because the sentence violated the federal constitution and our proportionality statute). Justice Dolliver's opinion lists the defects identified by the *Harris* court, yet fails to address, let alone explain, why those concerns have no merit. See designated majority, at 208.

As I have repeatedly indicated, and as the *Harris* court noted, the chief difficulty in conducting proportionality review is the Legislature's failure to adequately define key terms, which makes difficult both the sentencer's task of deciding to impose the death penalty, and this court's review of that decision. *See Harris*, at 1289; *see also State v. Campbell*, 103 Wn.2d 1, 41, 691 P.2d 929 (1984) (Utter, J., concurring in part/dissenting in part), *cert. denied*, 471 U.S. 1094 (1985); *see State v. Jeffries*, 105 Wn.2d 398, 434-35, 717 P.2d 722 (Utter, J., dissenting), *cert. denied*, 479 U.S. 922 (1986).

The statute directs the jury at the end of the sentencing proceeding to answer the following question: "Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient *mitigating circumstances* to merit leniency?" (Italics mine.) RCW 10.95.060(4). Yet the Legislature has not defined "mitigating circumstances".

One commentator has drawn out the implications of this shortcoming:

> What is a mitigating circumstance? Is poverty a mitigating circumstance? Is the lack of employment opportunities a mitigating circumstance? . . .
>
> Is it a mitigating circumstance that the accused has, notwithstanding this commission of an aggravated murder, acquired a

reputation of being unusually generous and charitable to other members of the community?

James E. Lobsenz, *Unbridled Prosecutorial Discretion and Standardless Death Penalty Policies: The Unconstitutionality of the Washington Capital Punishment Statutory Scheme*, 7 U. Puget Sound L. Rev. 299, 342-43 (1984).

Even if the statute defined mitigating circumstance, the Legislature has failed to provide any guidance whatsoever as to how to weigh one mitigating circumstance against another. The result is that the concept "mitigating circumstance", far from reducing arbitrariness, can be used as a vehicle to rationalize the result the jury, and this court, wishes to reach. To the extent this is true, the statute permits the exercise of standardless sentencing discretion disapproved by the United States Supreme Court. *See Furman v. Georgia*, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972).

With respect to review of the sentencer's decision, RCW 10.95.130 requires this court to determine

> (b) Whether the sentence of death is excessive or disproportionate to the penalty imposed in *similar cases*, considering both the crime and the defendant. For the purposes of this subsection, 'similar cases' means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120;

(Italics mine.)

The statute identifies the cases to which the court should look as a threshold matter in selecting a pool of similar cases. Once that pool is selected, however, the statute is silent as to how to evaluate the cases substantively against one another. *See Jeffries*, 105 Wn.2d at 434-35 (Utter, J., dissenting). As the *Harris* court noted,

> Neither the state legislature nor the State Supreme Court has determined what else should be considered in determining

'similar cases, considering both the crime and the defendant.' RCW 10.95.130(2)(b). What about age? Race? Sex? Pregnancy? . . . Disability? Mental Status? Diminished capacity? Emotional Status? Competence of counsel? Delay in prosecution? Motive? Acquittals of co-defendants? Can the Supreme Court go outside the confines of RCW 10.95.130(2)(b) to find "similar cases"? What about cases from other jurisdictions? What about similar crimes where aggravation was not charged? Similar first degree murder cases where aggravation could have been, but was not charged? Not guilty verdicts in aggravated and first degree murder cases where death was not requested and no reports were filed?

*Harris v. Blodgett*, 853 F. Supp. 1239, 1289 (W.D. Wash. 1994). *See also Harris*, at 1289 (recognizing the statute does not establish a coherent standard by which the selected cases can be reviewed).

In addition to the problems just discussed, the statute does not establish any procedure to be followed in instances where no "similar case" can be identified from among prior murder cases. *See Harris*, at 1289. *See also* W. Ward Morrison, Jr., Comment, *Washington's Comparative Proportionality Review: Toward Effective Appellate Review of Death Penalty Cases Under the Washington State Constitution*, 64 Wash. L. Rev. 111 (1989), arguing that proportionality review violates article 1, section 14 of the Washington State Constitution.

Compounding the difficulties resulting from the absence of legislative direction with respect to the meaning of key terms is the Legislature's failure to provide a regularized procedure by which the parties may be notified of which cases the court may deem similar, until after the decision in the case has been rendered. *Harris*, at 1289.

Another flaw in the statutory design is its failure to establish a mechanism for factfinding as part of the sentence review process. I made this point in *State v. Jeffries*, 105 Wn.2d 398, 435, 717 P.2d 722 (Utter, J., dissenting), *cert. denied*, 479 U.S. 922 (1986), where I indicated this court is effectively required to weigh the evidence of aggravating and mitigating circumstances "without the benefit of

factual findings on many of them." This difficulty was also recognized by the federal court reversing Harris's sentence of death. There, the court correctly observed that the majority's statements amounted to findings of fact; that an appellate court is generally prohibited from engaging in factfinding if the trial court has not entered its own; and that it is altogether unclear whether RCW 10.95.120 was intended by the Legislature as a mechanism for factfinding. *See Harris*, at 1290 (citing *State v. Marchand*, 62 Wn.2d 767, 770, 384 P.2d 865 (1963) and cases cited therein).

B. Unconstitutionality of the Review Process as Developed by This Court.

This court could have responded to the statute's shortcomings by developing a jurisprudence which assigned meaningful content to key terms, and thus established a basis upon which a constitutional, reasoned and principled evaluation of the proportionality of a given sentence could proceed. Regretably, it has done the contrary.

With respect to mitigating circumstances, for example, this court has held that jurors are not required to specify what mitigating circumstances they considered in concluding that insufficient circumstances existed to merit leniency. *See State v. Jeffries*, 105 Wn.2d 398, 717 P.2d 722, *cert. denied*, 479 U.S. 922, 93 L. Ed. 2d 301, 107 S. Ct. 328 (1986). By virtue of that decision, we are now forced to review the jury's conclusions as to the absence of sufficient mitigating circumstances without an adequate record as to the jury's deliberations.

As for the term "similar cases", the court has ignored the statutory mandate the court include in its proportionality review aggravated murder cases in which the death penalty was not imposed. *See State v. Jeffries*, 105 Wn.2d 398, 432, 717 P.2d 722 (1986) (Utter, J., dissenting), *cert. denied*, 479 U.S. 922 (1986); *State v. Lord*, 117 Wn.2d 829, 939, 822 P.2d 177 (1991) (Utter, J., dissenting), *cert. denied*, 113 S. Ct. 164 (1992). At other times, it has failed to define the universe of

relevant cases with any analytical discipline. *See In re Jeffries*, 114 Wn.2d 485, 505, 789 P.2d 731 (1990) (Utter, J., concurring in part/dissenting in part) (discussing *State v. Rupe*, 108 Wn.2d 734, 743 P.2d 210 (1987), *cert. denied*, 486 U.S. 1061 (1988)); *State v. Rice*, 110 Wn.2d 577, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989). *See also State v. Benn*, 120 Wn.2d 631, 697-98, 845 P.2d 289 (Utter, J., dissenting), *cert. denied*, 126 L. Ed. 2d 331 (1993).

Finally, with respect to substantively evaluating the sentences imposed in similar cases, the court has remedied the absence of legislative guidance in the statute by sanctioning an "impressionistic" review of the appellate reports. *See Lord*, 117 Wn.2d at 911 (characterizing the statutorily mandated proportionality inquiry as a search for "family resemblances"). *See also State v. Benn, supra.*

Justice Dolliver's opinion does not view the form judicial review has taken with consternation. On the contrary, it declares that "an *even broader* review" may be appropriate. Designated majority, at 209.

What that opinion characterizes as "an increasingly broad approach" to defining "similar cases" is more aptly described as the gradual degeneration of judicial review in capital cases, a process which reaches its low point with the introduction into our proportionality analysis of a new, and curiously elusive, concept: all murders falling within the purview of RCW 10.95 are, ipso facto, proportionate — except when they are not:

> [T]he legislative guidelines contained in RCW 10.95 within which the jury must exercise its discretion ensure proportionality and eliminate the ability of the jury, in all but the most aberrant case, to impose the death sentence in a wanton and freakish manner. Thus, our review, to be constitutionally sufficient, need only find that aberrant or "disproportionate" case. RCW 10.95.130(2)(b).

Designated majority, at 210-11.

Although purportedly advanced to circumvent the problems inherent in proportionality review, see designated

majority at 209, this statement of the law creates more difficulties than it avoids. If RCW 10.95 "ensures proportionality", can there ever be a "disproportionate" case? If so, by what process, and according to what standards, are we to identify it? The designated majority offers no answers.

The articulation of our obligations under the statute, as expressed in Justice Dolliver's opinion, also ignores the fact we need be mindful not only of constitutional norms, but also of the statutory directives the Legislature has imposed. It is therefore altogether inadequate to suggest that a review which passes constitutional muster is legally sufficient to uphold a sentence of death. We must also comply with a statute which specifically requires us to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, *considering* both the *crime* and the *defendant.*" RCW 10.95.130(2)(b). Justice Dolliver's opinion ignores this portion of the statute in favor of a rule which provides no guidance and hence makes it more, rather than less, likely the death penalty will be imposed in a standardless manner.

The danger created by the absence of analytical rigor in conducting proportionality review is dramatically evident at page 213 of the designated majority. The entire proportionality analysis amounts to a few sentences. There is no discussion of other cases, much less a methodical comparison of the record in this case with that in others as RCW 10.95.130(2)(b) expressly *requires.* The opinion simply asserts, in conclusory fashion, that "reviewing the totality of similar cases, we hold Brett's death sentence is not disproportionate. There is no unique or distinguishing characteristic of the Defendant or of this crime which makes imposition of the death penalty wanton and freakish." Designated majority, at 213.

At least two points are in order. First, to treat "aberrant" or "wanton and freakish" as the applicable standard is to oversimplify the legislative intent underlying RCW 10.95. The statute may have its shortcomings. It nevertheless repre-

sents a relatively sophisticated legislative effort to establish the basis for a rational review process. That process cannot properly be condensed into the designated majority's summation of it. See designated majority, at 213.

To the extent the court's review violates the statutory directive to engage in proportionality review, it may also violate Brett's rights under the United States Constitution, because the failure of a state to respect the terms of its own statutory obligations may implicate a liberty interest under the Fourteenth Amendment against arbitrary deprivation by a state. *See State v. Benn*, 120 Wn.2d 631, 698, 845 P.2d 289 (Utter, J., dissenting), *cert. denied*, 126 L. Ed. 2d 331 (1993); *Fetterly v. Paskett*, 997 F.2d 1295, 1300 (9th Cir. 1993); *see generally Hewitt v. Helms*, 459 U.S. 460, 74 L. Ed. 2d 675, 103 S. Ct. 864 (1983) (mandatory state procedures may give rise to a protected liberty interest); *but cf. In re Cashaw*, 123 Wn.2d 138, 144, 866 P.2d 8 (1994) (state regulations establishing only procedural guidelines for official decisionmaking do not create a liberty interest, but "laws that dictate particular decisions given particular facts can [do so]".

In overturning a death sentence on grounds which included a violation of the defendant's procedural due process rights, the federal district court in *Harris* recently held that when a state provides a right of review or appeal, the state must comply with the requirements of the due process clause of the Fourteenth Amendment. *Harris v. Blodgett*, 853 F. Supp. 1239, 1286 (W.D. Wash. 1994) (citing *Evitts v. Lucey*, 469 U.S. 387, 401, 83 L. Ed. 2d 821, 105 S. Ct. 830 (1985) and cases cited therein). The court explained this right includes "adequate, *meaningful*, notice of the *procedure* to be followed", (italics mine) *Harris* at 1291, as well as a "meaningful opportunity to [be heard]" and to "argue the strengths of his position and to attack the position of the party who seeks to deprive [him] of his interest." *Harris*, at 1287. The conclusory treatment of the proportionality issue in Justice Dolliver's opinion denies Brett these rights.

Second, even if "aberrant" or "wanton and freakish" were the standard, and it is not, it is impossible to conclude a given sentence is not "aberrant" or "wanton and freakish" without engaging in some process of reflection, whatever that may be. The designated majority requires that one simply take its word on so important a question as whether a defendant properly may be executed, without revealing what that process is. It thus forecloses any possibility of review or even discussion of its conclusion. This approach violates the equal protection clause of the fourteenth amendment to the United States Constitution because it provides no safeguard against a death penalty which is applied arbitrarily and without meaningful standards. *See Furman v. Georgia*, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972) (holding that the imposition of the death penalty in an arbitrary manner constitutes cruel and unusual punishment in violation of the eighth and fourteenth amendments to the United States Constitution); *see also State v. Campbell*, 103 Wn.2d 1, 42, 691 P.2d 929 (1984) (Utter, J., concurring in part/dissenting in part), *cert. denied*, 471 U.S. 1094 (1985); *see also Harris*, at 1291 (holding Harris's proportionality review violated his due process rights under the federal constitution). A state sentencing scheme must provide a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Furman*, 408 U.S. at 313 (White, J., concurring).

One commentator, discussing North Carolina's capital sentencing statute, whose language is similar to our own, has explained the critical importance of properly conducting review as follows:

The statutory, constitutional, and philosophical validity of capital punishment is based in part on the notion that the discretionary process of imposing the death penalty will be subject to appellate review so that any abuse of sentencing discretion will be reversed. One reason so much weight is placed on this review process is the belief that review will be undertaken carefully, thoughtfully, rationally, and consistently. One tradi-

tional way that courts have assured that this faith is not misplaced is to give reasons that indicate how and why [the State's Supreme Court] decisions are made. Thus, the failure of the . . . Court to articulate a theoretical model for its proportionality review casts doubt on the legitimacy of the death penalty in this State.

(Footnotes omitted.) F. Patrick Hubbard et al., *A "Meaningful" Basis for the Death Penalty: The Practice, Constitutionality, and Justice of Capital Punishment in South Carolina*, 34 S.C. L. Rev. 391, 464 (1982).

The same is true in Washington. To the extent this court continues to engage in reflexive affirmances of death sentences without structuring a careful, thoughtful and rational review process, the imposition and affirmance of capital sentences will continue to be illegitimate.

My recent dissent in *State v. Benn*, 120 Wn.2d 631, 845 P.2d 289 (Utter, J., dissenting), *cert. denied*, 126 L. Ed. 2d 331 (1993) demonstrates the task of engaging in proportionality review is not so elusive as to defy the capacities of this court. Other jurisdictions with statutes virtually identical to our own have structured a review process which addresses the issue whether the sentence of death is disproportionate in a manner which respects the legislative guidelines set forth in their proportionality statutes.

Pennsylvania, for example, has a proportionality statute which resembles our own. 42 Pa. Cons. Stat. Ann. § 9711(h)-(3)(iii) (Supp. 1994). The Pennsylvania Supreme Court examines the relative frequency of death sentences in the pool of similar cases it develops, finding death sentences not disproportionate where the vast majority of defendants in similar cases received the death penalty. *See, e.g., Commonwealth v. Smith*, 511 Pa. 343, 513 A.2d 1371 (1986) (finding the death penalty not disproportionate where it was imposed in eight of nine similar cases), *cert. denied*, 480 U.S. 951 (1987); *Commonwealth v. Whitney*, 511 Pa. 232, 249-50, 512 A.2d 1152 (1986) (finding the death penalty not disproportionate where it was imposed in the "overwhelming majority" of similar

cases); *Commonwealth v. Pirela*, 510 Pa. 43, 507 A.2d 23 (1986) (finding the death penalty not disproportionate where it was imposed in six of eight similar cases); *Commonwealth v. Morales*, 508 Pa. 51, 494 A.2d 367 (1985) (finding the death penalty not disproportionate where imposed in seven of seven similar cases).

North Carolina too has a statute requiring proportionality review. Its statute contains language identical to our own, insofar as it asks whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C. Gen. Stat. § 15A-2000(d)(2) (1994). In that jurisdiction, the penalty of death is considered disproportionate if it has been imposed in less than half the similar cases. *See, e.g., State v. Cummings*, 323 N.C. 181, 198, 372 S.E.2d 541 (1988) (finding the death penalty not disproportionate where it was imposed in four of five other cases in which a defendant was convicted of a prior violent felony resulting in the victim's death), *cert. granted and judgment vacated on other grounds*, 494 U.S. 1021 (1990); *State v. Benson*, 323 N.C. 318, 328-29, 372 S.E.2d 517 (1988) (finding the death penalty disproportionate where it was imposed in only 4 of 51 robbery-murder cases); *State v. Stokes*, 319 N.C. 1, 22 n.14, 352 S.E.2d 653 (1987) (finding the death penalty disproportionate because the codefendant received a life sentence and because North Carolina juries have recommended life imprisonment in especially heinous cases in 20 cases involving 24 defendants, while recommending the death penalty in 16 cases involving 17 defendants); *State v. Rogers*, 316 N.C. 203, 235, 341 S.E.2d 713 (1986) (finding death penalty disproportionate for a defendant found guilty of shooting one person and attempting to shoot another, where in the pool of similar cases, the death penalty was imposed in 23, and life sentences in 76), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985) (finding the death penalty disproportionate where it was imposed in 5 of 28 robbery-murder cases in the pool of similar cases); *State v. Bon-*

*durant,* 309 N.C. 674, 693, 309 S.E.2d 170 (1983) (finding the death penalty disproportionate where applied in 13 of 78 similar cases).[2]

It is notable the North Carolina Supreme Court has not been stymied in fulfilling its obligation to conduct proportionality review by the requirement that it consider similar cases. In the cases cited above, the court engaged in a process in which it justified its inclusion of particular cases within the pool of similar cases, based on the record, including but not limited to a consideration of aggravating and mitigating circumstances.

Two North Carolina cases, one in which the court invalidated the defendant's sentence of death, and one in which it did not, demonstrate that it is possible to structure proportionality review in a manner that yields meaningful conclusions about the proportionality of a given sentence. At the very least, these cases establish that sentences of death are not affirmed reflexively in North Carolina, a conclusion which cannot be said of Washington.

In *State v. Benson, supra,* the North Carolina Supreme Court struck down the defendant's sentence of death for a murder committed in the course of a robbery. The court identified 51 robbery-murder cases in the pool. Of those it found 44 had resulted in life sentences and only 7 in the sentence of death. The court reasoned that in 5 of these robbery-murder cases, the only aggravating circumstance was pecuniary gain, and that life sentences were imposed in 4 of those 5. The court then examined the circumstances of the one remaining case in which the jury had returned a sentence of death for a robbery-murder where the only aggravating circumstance was pecuniary gain. Although the mitigating circumstances in that case were weaker than in the case before it, the court noted the death sentence had been found dis-

---

[2]The North Carolina Supreme Court has stated that numerical disparity is not always dispositive where some additional heinous fact is involved. *See, e.g., State v. Greene,* 324 N.C. 1, 23, 376 S.E.2d 430 (1989) (finding the death penalty not disproportionate where the defendant committed a brutal parricide), *cert. granted and judgment vacated on other grounds,* 494 U.S. 1022 (1990).

proportionate. The court also noted that in the robbery-murder cases in which the sentence of death was upheld, all but two involved multiple killings. Although the court acknowledged the crime of the defendant before it was outrageous, it concluded the death penalty could not be considered proportionate. *Benson*, 323 N.C. at 328.

In *State v. Cummings, supra*, the North Carolina Supreme Court engaged in a similarly careful examination of cases and reached the opposite conclusion. The jury found the fact Cummings had a prior capital felony conviction an aggravating circumstance. The court selected its pool of similar cases by identifying five cases in which the defendant had been convicted of a prior violent felony resulting in the victim's death. The court stated that in four of the five the jury imposed the penalty of death, notwithstanding the presence of mitigating circumstances. In the one case in which the jury recommended a life sentence there had been mitigating circumstances. In contrast, no mitigating circumstances existed in the case before the court. The court concluded that "[i]n the absence of substantial mitigation, we cannot say that defendant's sentence is disproportionate when compared to other cases involving a prior homicide conviction." *Cummings*, 323 N.C. at 198. The court also identified a case it considered bore a close factual similarity to the one it was considering in which the jury recommended the death penalty. There, the crime was similar; there were no mitigating circumstances, and the sole aggravating circumstance found was a prior violent felony. The court concluded, "[w]e find nothing in the record to meaningfully differentiate the instant case from [that case] or to demonstrate that this defendant is any less deserving of the death penalty than [the defendant]." *Cummings*, 323 S.C. at 199.

Whatever reservations one may have about the selection of the cases constituting its pool of similar cases, the very fact the North Carolina court respected its statutory obligation to compare the crime and the defendant with other

similar cases, structured a rational and principled process of arriving at its determination, and saw fit to justify its decision, impart to its ultimate conclusion a legitimacy wholly absent from the designated majority and the plurality here.

## C. Unconstitutionality of Imposing the Death Sentence as Applied in Brett's Case.

If this court engages in a reasoned and systematic review of cases whose salient features resemble Brett's, as the statute mandates, it would be apparent that Brett's sentence of death is disproportionate and should be reversed. It simply cannot be said that capital punishment is generally imposed in cases similar to Brett's.

RCW 10.95.130(2)(b) directs us to determine:

> Whether the sentence of death is excessive or *disproportionate to the penalty imposed in similar cases,* considering both the *crime* and the *defendant.* For the purposes of this subsection, "similar cases" means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120; . . .

(Italics mine.)

I have consistently maintained that if proportionality review is to have meaning, this court must, as RCW 10.95.130 directs, consider all the cases in which the defendant was found guilty of aggravated first degree murder, regardless of whether the death penalty was imposed or carried out in that case. RCW 10.95.120. *See, e.g., State v. Lord,* 117 Wn.2d 829, 939, 822 P.2d 177 (1991) (Utter, J., dissenting), *cert. denied,* 506 U.S. 856 (1992).

This court has held that a sentence is excessive or disproportionate if it has not "generally" been imposed in similar cases. *In re Jeffries,* 114 Wn.2d 485, 491, 789 P.2d 731 (1990); *State v. Rupe,* 108 Wn.2d 734, 767, 743 P.2d 210 (1987), *cert. denied,* 486 U.S. 1061 (1988); *State v. Harris,*

106 Wn.2d 784, 798, 725 P.2d 975 (1986), *cert. denied*, 480 U.S. 940 (1987).

The approach I advocated in *State v. Jeffries*, 105 Wn.2d 398, 436, 717 P.2d 722 (Utter, J., dissenting), *cert. denied*, 479 U.S. 922 (1986), and which remains valid today, proceeds in two steps. The first involves electing a universe of similar cases from the statutorily defined pool by selecting the most salient factors which characterize those cases and comparing them to the case at hand. The second involves determining whether the death penalty has generally been imposed within that pool. If it has not generally been imposed, the sentence of death is disproportionate, and should be reversed. *See State v. Jeffries*, 105 Wn.2d at 436-37 (Utter, J., dissenting); *In re Jeffries*, 114 Wn.2d at 490; *State v. Rupe*, 108 Wn.2d 734, 767, 743 P.2d 210 (1987), *cert. denied*, 486 U.S. 1061 (1988); *Lord*, 117 Wn.2d at 939 (Utter, J., dissenting).

The salient characteristics of the crime, for the purposes of assembling a universe of "similar" cases under RCW 10.95.130(2)(b) are the following: a single homicide of an adult, in which death was relatively immediate. The salient characteristics as they pertain to the Defendant are that Brett has a significant criminal record. Although he does have a criminal history, Brett has no previous murder or manslaughter conviction. Also significant are the mitigating circumstances in Brett's case. He presented evidence he was exposed to alcohol in utero and may suffer from fetal alcohol syndrome as a result, has impaired cognitive ability, and suffers from severe diabetes and alcohol abuse.

Below are cases from the aggravated murder reports which may reasonably be considered "similar" to Brett's insofar as the features of the crime or the defendants share salient features. This list establishes that defendants found guilty of similar crimes do not generally receive the sentence of death in Washington. Brett's sentence is therefore disproportionate and must be reversed.

Paul St. Pierre

Report of the Trial Judge (Questionnaire No. 34(a)) (Pierce Cy. cause 84-1-00992-8). St. Pierre shot and stabbed his victim. The aggravating factor was that he committed the crime to conceal another murder. He had a previous aggravated murder conviction. The jury imposed life without the possibility of parole.

Donald Christopher Galbert

Report of the Trial Judge (Questionnaire No. 33) (Clark Cy. cause 84-1-000775). Galbert bludgeoned his victim to death with a pipe, smashing his skull. The aggravating factor was robbery. He had prior convictions for burglary, rape, larceny, forgery and dealing drugs. There were no mitigating circumstances. He received life without the possibility of parole.

James J. Daugherty

Report of the Trial Judge (Questionnaire No. 25) (Kitsap Cy. cause 84-1-00265-2). Daugherty shot the victim six times in the back of the head. The aggravators were concealment and robbery. Daugherty had a criminal history including five felony property offenses. The jury did not impose the death penalty. He received life without the possibility of parole.

Gus Allen Turner

Report of the Trial Judge (Questionnaire No. 28) (Clark Cy. cause 83-1-00067-0). Turner shot his victim in the chest. The report states he had an extensive record of criminal convictions under different names. The aggravating circumstance was that the homicide was committed in the course of a robbery. No mitigating circumstances are listed in the report. He received life without the possibility of parole.

David John Lennon

Report of the Trial Judge (Questionnaire No. 35) (Benton Cy. cause 84-1-00178-3). Lennon inflicted multiple gunshot wounds to the victim who had given him a ride in a car. The aggravating circumstances were that he was an escapee from Oregon, committed the crime in furtherance of a robbery and to conceal the commission of a crime. There were

no mitigating circumstances. The death penalty was not sought.

### Robert Wayne Hughes

Report of the Trial Judge (Questionnaire No. 23) (King Cy. cause 82-1-01979-4). Hughes shot and killed a law enforcement officer. He had prior convictions for assault, escape and murder. No mitigating circumstances appear in the report. He received life without the possibility of parole.

### Jeremiah J. Bourgeois

Report of Trial Judge (Questionnaire No. 139) (King Cy. cause 92-1-06444-4). Bourgeois entered a store and shot the victim to death with a shotgun. The aggravating factor was that the victim was a witness or a participant in an adjudicatory proceeding. Bourgeois had three prior convictions for taking a motor vehicle, one for theft and one for criminal trespass. No mitigating circumstances appear in the report. The death penalty was not sought.

### Charles Harris

Report of the Trial Judge (Questionnaire No. 38) (King Cy. cause 85-1-00093-1). Harris shot his victim to death. The murder was committed to conceal the commission of the crime or his identity. Harris had a prior murder conviction. No mitigating circumstances are listed in the report. He received life without the possibility of parole.

### Constantine B. Baruso

Report of the Trial Judge (Questionnaire No. 112) (King Cy. cause 90-1-06199-6). Baruso shot his victim in the back. Three aggravating circumstances were present. No mitigating circumstances are listed. He received life without the possibility of parole.

### Charles Graves

Report of the Trial Judge (Questionnaire No. 126) (King Cy. cause 92-1-00393-3). Graves shot and killed his ex-wife in the course of a burglary. He had three prior convictions for trespass and one for assault. There were no mitigating circumstances. He received life without the possibility of parole.

Dwayne Earl Bartholomew

Report of the Trial Judge (Questionnaire No. 3) (Pierce Cy. cause 81-1-00579-1). Bartholomew shot a laundromat attendant. The aggravating factors were that he committed the murder in the course of a robbery, and murdered the victim to conceal the identity of the perpetrator. His prior convictions included criminal trespass, theft, and possession of stolen property. No mitigating circumstances are listed in the report. The jury imposed the sentence of death.[3]

Benjamin Harris

Report of the Trial Judge (Questionnaire No. 29) (Pierce Cy. cause 84-1-01190-6). The murder was a contract killing. The victim was shot. Harris had a prior assault and manslaughter conviction. No mitigating circumstances appear in the report. He was sentenced to death.[4]

Of the 13 cases listed above which are similar to Brett's in that the crimes involved a single homicide of an adult, and death was relatively immediate, it cannot be said the death penalty has generally been imposed. This is true even in cases arguably worse than Brett's, insofar as the defendant's history included a prior homicide and no mitigating circumstances were present. Brett has no prior homicide conviction, and he presented significant mitigating evidence. Under these circumstances, Brett's sentence of death must be reversed under RCW 10.95.130(2)(b).

### III

#### PENALTY PHASE INSTRUCTIONS

Brett maintains the penalty phase instructions violated federal and state due process and cruel punishment clauses

---

[3]Bartholomew's sentence was vacated on direct appeal. *State v. Bartholomew*, 101 Wn.2d 631, 683 P.2d 1079 (1984). The State was ordered to present the sentencing issue to the second jury, *State v. Bartholomew*, 104 Wn.2d 844, 710 P.2d 196 (1985), which declined to impose the penalty of death. Accordingly, Bartholomew received a life sentence without the possibility of parole.

[4]Harris's sentence was recently reversed by a federal court on numerous grounds, including lack of proportionality. *Harris v. Blodgett*, 853 F. Supp. 1239 (W.D. Wash. 1994).

by suggesting that a verdict of life must be unanimous. The majority asserts the instruction was not confusing. I disagree. Under *Mak v. Blodgett,* 970 F.2d 614 (9th Cir. 1992), *cert. denied,* 507 U.S. 951, 122 L. Ed. 2d 742, 113 S. Ct. 1363 (1993), an instructional error was committed.[5]

In *Mak v. Blodgett, supra,* the same instructional flaw as occurred in instruction 10, considered together with the identical verdict form, "combined to improperly emphasize to the jury that unanimous agreement was required not to impose the death penalty." 970 F.2d at 625. The *Mak* court relied on *Mills v. Maryland,* 486 U.S. 367, 383, 100 L. Ed. 2d 384, 108 S. Ct. 1860 (1988), which held that where the underlying statute does not require unanimity, the defendant's due process rights are violated by providing the jury instructions that could reasonably be interpreted by its members to preclude consideration of a mitigating factor unless the factor was unanimously found to exist.

Penalty phase instruction 10 read in pertinent part:

> You must answer one question. *All twelve of you must agree before you answer a question "yes" or "no". When all of you have agreed,* fill in the answer to the question in the verdict form to express your decision. If all twelve of you are unable to unanimously agree, fill in the answer to the question in the appropriate place on the verdict form. . . .

(Italics mine.) Clerk's Papers, at 553.

The penalty phase verdict form indicated:

> Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?
>
> ANSWER:
>
> [___] "Yes" (In which case the defendant shall be sentenced to death)

---

[5]The confusion the instruction may have engendered should be considered in conjunction with the prosecutor's misstatement of the law during his closing argument. In closing, the prosecutor suggested the *Defendant* bore the burden of proving there were sufficient mitigating circumstances to warrant leniency:

> Mr. Dane references life without parole, but the question is not whether life without parole is good enough. The question is whether having in mind the crime, you're convinced beyond a reasonable doubt there's sufficient mitigating circumstances.

Report of Proceedings vol. 18, at 127. There was no objection.

[____] "No" (In which case the defendant shall be sentenced to life imprisonment *without possibility of parole*)

[____] "Unable to Unanimously Agree" (In which case the defendant shall be sentenced to life imprisonment without possibility of parole)

Clerk's Papers, at 554.

Instruction 10 is misleading, or at the very least confusing, because it suggests the jury must be unanimous before reaching a verdict. The law is to the contrary. RCW 10.95.030(1) establishes a presumptive sentence of life without the possibility of parole which can be overcome only by a unanimous jury determination that there are not sufficient mitigating circumstances to warrant leniency. *See* RCW 10.95.030(1); RCW 10.95.060(4). Unanimity is not required to reach a verdict; if the jurors do not unanimously agree, the death penalty cannot be imposed, and the defendant's sentence will be life without the possibility of parole.

The instructional error contained in instruction 10, together with the prosecutor's misstatement of the law in closing, create the possibility that a juror might have been confused. *See Mak v. Blodgett, supra* at 625. (The verdict is undermined if the instructions create the possibility that even one juror was confused, let alone misled.) (citing *Kubat v. Thieret*, 867 F.2d 351, 371 (7th Cir.), *cert. denied*, 493 U.S. 874 (1989)). To the extent that is true, the reliability of the verdict is undermined, and Brett should be resentenced.

IV

ERRONEOUS ADMISSION OF EVIDENCE AT THE PENALTY PHASE
Scope of Evidence Concerning Prior
Convictions: Admissibility

Brett argues the trial court erred in allowing cross examination of Sandra Youngen,[6] concerning her knowledge of facts underlying Brett's conviction for assault and kidnapping.

---

[6]Brett also challenges the evidence introduced during the cross examinations of mitigation witnesses Jeffrey Johnson and Dr. Owens. However, defense counsel did not object to the admissibility of their statements. Their failure to do so may provide additional grounds to find ineffective assistance of counsel.

Youngen testified she met Brett when he transferred from Echo Glen to Maple Lane and that he was not a management problem while at the latter facility. The prosecutor cross-examined Youngen as follows:

Q: Were you aware or did you know at the time that Mr. Brett was at Maple Lane that he had been previously convicted of assaulting a staff member at Echo Glen?

A: Yes, I was aware of that.

Q: Were you aware of the facts and circumstances of the particular offense?

A: Yes. You're talking about when — in the escape from Echo Glen?

Q: That's correct. Where he had plead [*sic*] guilty to Kidnapping in the First Degree, Assault in the Second Degree, and Escape in the First Degree for an incident that occurred March of 1985.

A: Yes, I was aware of that.

Q: *And were you aware of the fact that he had snuck up on a staff counselor from behind, placed a tightly wound towel around her mouth and then moved the towel to her throat and strangled her with the towel? Were you aware of that?* MR. FOISTER: I'm going to object to that question, Your Honor.

She's indicated she was familiar with the circumstances at Echo Glen.

MR. CURTIS: The jury's not.

THE COURT: It's overruled, Counsel. It's cross examination. I think it's appropriate. Go ahead.

Q: (BY MR. CURTIS) Were you aware of those facts?

A: I don't recall. I'm sure at the time I was because we do share that type of information but I don't specifically recall that the — the exact incidents that happened. I know there was an assault on a staff member in an escape attempt and that she was severely injured.

Q: *And that she was bound with electrical cord prior to Mr. Brett escaping?*

A: I do recall something about her being bound, yes.

Q: So in expressing your opinion to this jury that you were surprised that Mr. Brett was involved in the murder of a person, were you also incorporating into your thinking that prior incident which you had knowledge of?

A: I was. I was asked by counsel my reaction, and my initial reaction was I was very shocked when I heard the news.

Q: Even though you knew Mr. Brett has a history of violence in the juvenile system?

(Italics mine.) Report of Proceedings vol. 16, at 28-29.

Brett maintains the trial court erred in permitting the State to introduce before the jury evidence about the facts and circumstances attending his prior convictions. The majority disagrees on the ground *State v. Bartholomew*, 101 Wn.2d 631, 642-43, 683 P.2d 1079 (1984) (*Bartholomew* II) permits the prosecutor to "introduce evidence to rebut matters raised in mitigation by the defendant subject to the balancing test set forth in ER 403". Designated majority, at 189 (citing *Bartholomew* II, 101 Wn.2d at 642-43; *State v. Lord*, 117 Wn.2d 829, 891, 822 P.2d 177 (1991), *cert. denied*, 113 S. Ct. 164 (1992)).

The majority's suggestion that all evidence is admissible on cross examination for the purpose of rebuttal is unwarranted. This court expressly held that the admissibility of prior convictions under RCW 10.95.070 does not give the State an absolute license to expose the jury to the facts and circumstances attending those convictions. *See Bartholomew* II, 101 Wn.2d at 642-43. *Cf. Lord*, 117 Wn.2d at 889-90. Cross examination may not be conducted indiscriminately. ("We do not intend . . . that the prosecution be permitted to produce any evidence it cares to so long as it points to some element of rebuttal no matter how slight or incidental."), *Bartholomew* II, 101 Wn.2d at 643 (quoting *State v. Bartholomew*, 98 Wn.2d 173, 198, 654 P.2d 1170 (1982) (*Bartholomew* I), *State's cert. granted and remanded*, 463 U.S. 1203, *defendant's cert. denied*, 463 U.S. 1212 (1983)).

In deciding whether to admit the statements at issue, the trial court is required to apply a balancing test similar, but not identical, to that contemplated by ER 403. As I noted in *Lord*, under ER 405, once character evidence about the defendant has been introduced, the presumption is that rebuttal evidence is admissible. *Lord*, 117 Wn.2d at 890. The *opposite* presumption applies under the *Bartholomew* test: "Only if the rebuttal value of the evidence outweighs the prejudicial effect should the evidence be admitted." *Lord*, 117 Wn.2d at 928 (Utter, J., dissenting) (quoting *Bartholomew* II, 101 Wn.2d at 643) (quoting *Bartholomew* I, 98 Wn.2d at 198).

The State's introduction of the facts and circumstances surrounding Brett's assault was unwarranted given the presumption against admissibility established in *Bartholomew* II. Not only was the reference prejudicial, it was gratuitously so, because the State could have impeached Youngen's statements by simply referring to the conviction resulting from this assault, a conviction already before the jury.

To summarize, the disproportionality of Brett's sentence of death alone warrants the reversal of his sentence. In addition to its disproportionality, his sentence should also be reversed because the trial court's failure to grant Brett a continuance to obtain an expert's evaluation of whether he suffers from fetal alcohol syndrome compromised his capacity to adequately develop and present mitigating evidence; the scope of the evidence admitted to rebut his mitigation witnesses exceeded its permissible scope; and the instructional error suggesting unanimity was required before the jury could reach a final verdict was confusing and therefore casts doubt on its decision to impose the penalty of death.

SMITH and JOHNSON, JJ., concur with UTTER, J.

Reconsideration denied June 9 and August 17, 1995.